Bland, Chancellor.
The defendants William J. B. Duncan and Caroline Duncan, and Joseph Robinson, having been returned summoned, and not having appeared, or filed their answers within the time allowed by the rules of the court, it is Decreed, that the plaintiffs are entitled to relief, but as it does not appear to what relief they are entitled, it is Ordered, that a commission issue to such person as the complainants may name to take testimony to ascertain to what they are entitled, (a)
The plaintiffs, by their petition, stated, that the defendant Thomas Iglehart, had died since the commencement of this suit; and that administration de bonis non upon the estate of the testator William Duncan, had been granted to John Iglehart. Whereupon they prayed that he might be accordingly summoned as a defendant. (b)
8th March, 1827.
Bland, Chancellor.
Ordered, that the said John Iglehart, be, and he is hereby made a party defendant, as prayed; and he is hereby directed to be summoned accordingly, to appear on the 10th day of April next; provided, that the summons be served as the law requires, on or before the twentieth instant.
After which, John Iglehart having been summoned, and having failed to appear and answer, a decree was, on the 20th of December, 1827, passed against him similar to that of the 6th of December, 1826. Under which decrees a commission was issued, in execution and return of which, the commissioners said that the solicitor of the plaintiff had produced and filed a certified copy of the last will and testament of William Duncan, which together with the commission, he returned and filed, on the 31st of Decem *48 her, 1827. No other testimony was taken or returned with that commission.
On the 24th of January, 1828, the infant defendants put in their answer, by their guardian ad litem, in which they said, that they knew nothing of the contents of the bill; nor could they admit them; but prayed that they might be proved, and that their interests might be protected.
21st February, 1828.
Bland, Chancellor.
This case standing ready for hearing, and having been submitted, the proceedings were read and considered.
The law of a case arises out of the facts of which it is constituted, and it is the duty of the court to declare what that law is. It is therefore not only unnecessary, but, in some cases it may be deemed impertinent, in a suitor to set forth, and comment upon what he conceives to be the law arising out of his case. To do so, without stating all the facts, or upon an imperfect statement of facts ; as for example, to charge a defendant with fraud, without stating any such facts, as in contemplation of law, constitute a fraud, can form no foundation for relief or defence. It is sufficient that each party should state the facts of his own case; and therefore, although it is not unusual for a plaintiff to state in his bill, by way of anticipation, some of the allegations and pretences of the defendant; it is not indispensably necessary, in any case, or even proper in all cases, to set forth any matter in the bill, which if brought out at all, should come from the defendant as constituting a part or the entire foundation of his defence. But, it is essential that the plaintiff should distinctly state every fact necessary to constitute such a case as gives him a right to claim relief from the defendant at the time of filing his bill; and moreover, to set forth those peculiar circumstances which justify him in passing by the ordinary tribunals of the common law, and coming into a Court of Equity to seek that relief. The plaintiff may state his case in the alternative, or with a double aspect, so 'that it may be considered in one way, or in another; provided, that in whatever way it is presented, it falls properly within the cognizance of a Court of Equity. Upon a case, so stated, the plaintiff may either pray for special or for general relief; or he may make both special and general prayers for relief. And where the nature of the case is such, that the special prayer or designated relief cannot be granted; then, under the general prayer, relief may be granted, suitable to the peculiar nature of the case; as to which the court *49 is not confined to that which may be specially asked or suggested, orally or otherwise; but may adapt the relief exactly to the nature of the case stated in the bill, regardless of any thing that may be said to the contrary by any of the parties. But if there be no general prayer, and the special prayer cannot be granted, the plaintiff must amend his bill or have it dismissed, (c)
Before a decree can be so correctly framed as to suit the peculiar nature of the case now under consideration, the court must be furnished with some further information, and with some statements by way of illustration of the bearings of the allegations of the bill. But no case can be sent to the auditor for any such purposes, where there is no ground for relief shewn by the pleadings, or where the facts as stated in the bill, do not, of themselves, exhibit a sufficient foundation for some relief, either under the special or the general prayer, (d) It will therefore be necessary to see whether these plaintiffs have stated such facts as constitute a case that entitles them to relief; and also to consider what are the powers and duties of the auditor to collect information, and make statements in cases of this kind.
The facts of which the plaintiffs have constituted their case, are these : William Duncan, being seized and possessed, in fee simple, of a parcel of land, containing two hundred and twenty-nine acres and a half, by his last will devised it to his two infant children, the defendants William and Caroline, and their heirs forever as joint tenants; and to his daughter Anna Maria, now the wife of the plaintiff Perry Townshend, he bequeathed an annuity of sixty dollars, to be paid to her out of the rents and profits of his real estate above mentioned, annually during her life; and appointed his wife Deborah, the mother of the defendants William and Caroline, his executrix; that the testator died in March, 1819; and the executrix Deborah, administered upon his estate, and paid to the plaintiff Anna Maria, her annuity for one year; after which the executrix Deborah died, and administration de bonis non was thereupon granted to Thomas Iglehart; that the defendant Robin *50 son, who is the guardian of the infant defendants William and Caroline, had also paid to the plaintiff Anna Maria, her annuity for one year, under the will of her father. But, that those defendants have failed and refused to pay any more of the annuity to her, either before, or since her intermarriage; and that the defendant Thomas Iglehart having died since the filing of the bill, and administration de bonis non having been granted to John Iglehart, he had been summoned as a defendant, and the suit had been revived against him accordingly.
Upon these facts the plaintiffs have prayed for an account; that the land might be sold; and that the proceeds thereof might be applied to the payment of their annuity with costs, and the balance so invested as to stand as an available fund to meet future instalments of said annuity; or, that such other relief might be given to them as to the court might seem meet.
It will be seen by adverting to the will of William Duncan deceased, that he has expressly declared, that the annuity should be paid out of the rents and profits of the estate; thus unequivocally shewing it to have been his intention, that it should be charged altogether and exclusively upon that estate; and that his personalty should be in no way liable (e) — consequently, it could not have been necessary for the plaintiffs to say any thing of the deceased’s personal estate; or to have made his executrix or administrator a party to this suit.
The subject claimed by these plaintiffs is an annuity charged upon, and payable out of the rents and profits of a certain real estate; which real estate, so charged, was devised to these infant defendants William and Caroline. These facts are sufficiently stated in the bill, and are more fully shewn by the last will of the testator, which is exhibited as a part of it. The bill further states, that after the death of the testator, Deborah, who was the mother of the infant defendants William and Caroline, paid the plaintiff Anna Maria one year’s annuity; and that the defendant Robinson, who is their guardian, also paid the plaintiff Anna Maria one year’s annuity, under her father’s will. Here then is a sufficient statement of the fact, that these infant defendants, by their mother, and afterwards by their legal guardian, took the real estate so devised to them; and actually, in consequence thereof, paid a part of the annuity so charged upon it.
*51 The bill, it is true, does not allege that the devisees, or their guardian, received the rents and profits of the land charged with the payment of the annuity. But no such allegation by the plaintiffs was necessary; since it was enough for them to have shewn, that the devisees actually took the estate as devised. If they derived no profit from it, it was their own fault; and a matter with which the plaintiffs could have no concern. If the estate charged was wholly insufficient to pay the annuity, they should have disclaimed all right to it; or the fact should have been, in some way, put upon the record by the defendants; which has not been done. But, according to the common law, the mother, as guardian, has an interest in, and is bound to take charge of her wards’ estate, (f) And by the common law, as well as by positive legislative enactment, a guardian of an infant is bound immediately to take possession of his ward’s real and personal estate; to manage it to the best advantage; and to account for its rents and profits, (g) It could not, therefore, be necessary for these plaintiffs to aver, as a foundation of their claim to relief, that the guardians of these infant devisees had received the rents and profits of their estate; or, in other words, that they had performed their legal duty; since that must be presumed; and a guardian himself surely could not be permitted to rely upon the fact of his own negligence for his own benefit. (h)
*52 But the plaintiffs are here asking a Court of Equity to enforce the payment of this annuity — an annuity, given by a will, is, for *53 many purposes treated as a legacy, and so considered, its payment may certainly be enforced in equity, (i) These plaintiffs could not proceed for the recovery of this annual sum, at common law, as for a rent charge; because no right of distress is given by the grantor, and it is not distrainable of common right: nor could they enter upon and hold the land charged until they were satisfied ; because the testator has given them no such authority. A writ of annuity, being a remedy at law against the person of the grantor of the annuity, it follows, that a devisee could not avail himself of it, as the ■ devisor ceased to exist before the gift of the annuity took effect, (j) The annual sum thus devised to the plaintiff Anna Maria, being made payable out of the land, might, however, be regarded as a rent seek; and as such, having been made distrainable by statute, it might be held, that the plaintiff should, in that way, obtain relief at law. (k) Or these plaintiffs might, with better apparent hope of success, bring a special action upon the case, the most flexible and comprehensive form of action known to the common law; yet the embarrassments and inconveniences of applying even that form of proceeding to the purposes of obtaining relief, in a case like this, are obvious, and would be very great. Before the statute which gave the power to distrain for rent seek, the payment of such rents might be enforced in equity; and even since, relief has been granted, in cases of rent charge, with an admitted power of distress and re-entry. The remedy in equity is manifestly more convenient and effectual, *54 safer and better. It may be found to be least injurious to the interest of these infants, and without disadvantage to any one else, to have the land sold for the payment of this, annuity; or it may be deemed necessary to have it raised out of the rents and profits by putting a receiver upon the estate, which could not be done by a court of common law, (l) or there may be a personal decree against them, or their guardian, in respect to the amount of the rents and profits received by them, (m) , It is therefore clear, that these plaintiffs have sufficiently set forth such a combination of facts, as shews that they have, a just claim to relief; and that they may, with propriety, ask that relief of a Court of Equity, (n)
It appearing then, that these plaintiffs have just grounds to ask relief of this court; and that, therefore, the case may be referred to the auditor, for any purpose falling within the scope of its duty; the next inquiry is, as to the mode in which they should be relieved. In making this inquiry, it must be recollected, that this is a case of provisions for children, which admits, perhaps, of a greater variety of determinations, and of judgment on circumstances, than any other kind of case, that can be brought before a Court of Equity; (o) and that the relief, whatever may be its form, is to be .granted against infants; for the protection of whose interests the court is in the habit of proceeding guardedly and with caution. (p) It will therefore be proper to make some inquiry into the particulars and details of this case, that the court may be enabled, properly to exercise its greater latitude of determination, for the benefit of all these children, and with the least disadvantage to the interests of these infants.
It may be, that this real estate is, in truth, of much less, or of no greater value than the annuity with which it is charged. In that case, it would be thus shewn to have been the intention of the testator, who must have known the value of his estate, to give to the plaintiff, Anna Maria, a life interest in it; or that, whatever might have been his intention, his express direction would be *55 carried into effect, most beneficially for all concerned, by a sale. But if, on the other hand, it should appear, that the annual value of the land was greatly more than sufficient to pay the annuity, then it may fairly be inferred, that the testator could not have intended, that the estate should be sold; but as the annuity might, so it should, as expressly directed, be raised out of the rents and profits. (q) In order to form a correct opinion as to those matters, an inquiry must be made, and the court must be informed, as to the •value of the land; the amount of its annual value; of its rents and profits; and also of the age and health of the annuitant, so as to enable it to put a present value upon the annuity, compared with the land upon which it is charged. And as there may be a personal decree, in respect to the amount of the rents and profits actually received, or which might, and ought to have been received by some of these defendants, it will be proper to have an inquiry made, and information laid before the court as to those matters also.
The mode of making such inquiries, and of obtaining information, in cases like this, by a reference to a master, is common and well settled in England; but here, as this court has now no officer belonging to it denominated, a Master in Chancery, I deem it proper in this, the first case of the kind which has been brought before me, to take such a comprehensive view of the office of the auditor, as may enable me to see how far the powers and duties of a master in chancery in England, in making all such special investigations, have devolved or been conferred upon the auditor here, in addition to those with which he has been expressly clothed by the act of assembly under which he is appointed. (r)
In England, the officers called masters in chancery, are assistants and associates to the Chancellor; and two of them at a time, by turns, usually sit with him in court. They have the power to administer oaths, take affidavits, and acknowledgments of deeds, recognizances, &c. (s) It is the duty of a master to execute the orders of the court upon references made to him by it, acting, either in exercise of its original jurisdiction, or under the authority of any act of parliament. The heads of reference that may be made to a master, are almost as numerous as the matters subject to the jurisdiction of the court. For example, a case may be *56 referred to a master to take accounts between parties of every description; to inquire into the claims of creditors, legatees, and next of kin; to inquire into repairs to be done; to inquire and state what would be a sufficient allowance for the maintenance and educátion of an infant, or for the maintenance of any one, the amount of which, as claimed, was left uncertain; (t) to inquire into the value of an estate for the purpose of enabling a party to elect, to assist the court in fixing upon a price, or in making an investment; (u) to inquire whether it would be most for the benefit of an infant, or feme covert to take under a will, or against it; (w) or to inquire into the value of an annuity, and of the estate upon which it is charged. (x) Where the plaintiff’s claim was founded on a variety of deeds, wills and other instruments, the general purport only of which wras stated in the bill, it was referred to a master to state a case of the rights claimed by the plaintiff under those instruments ; (y) and so too, where the bill had not minutely charged every particular circumstance, which, as matters of evidence, it would not have been proper to charge, and yet it appeared, that the case turned upon it, and no notice or opportunity had been given to the other side to answer it, the case was referred to a master to make inquiry and report such particulars. (z) And the court is much in the habit of directing inquiries with respect to material points, in order to supply the defect of proofs in the case, where a sufficient ground has been shown of the propriety of such inquiry, (a)
In general, there is no question of law or equity, or disputed fact, respecting which, a master may not be called upon to make a report; (b) and in order to enable him to do so, the parties should lay before him a statement of facts ; (c) and he may call for proofs, and himself examine witnesses on oath. (d) But although such examinations, before a master himself, are made privately; no publication passes, as of depositions taken before commissioners, (e) If proof be wanted, and the master so certifies, a commission *57 may be issued as of course; or the proofs may be taken before an examiner, which are returned, and an order of publication passes, as in all other cases, (f) The report of a master ought to be without any unnecessary recitals, as succinct as may be ; and confined to that which has been referred to him; for as to all else, it may be treated as a nullity; and it should reserve the matter clearly for the judgment of the Chancellor, who alone is the judge. (g) But if a master conceives it to be proper, under the peculiar circumstances of the case, to make a special report, in doing so, he is not to set forth the evidence, with his opinion upon it; but only the bare facts for the opinion of the court, in the same manner as in a special verdict, (h) unless he should be specially directed to give his reasons, (i) But under a decree for an account, he may, if he thinks proper, state special matter, although he has no direction for that purpose, (j) If, however, a master is directed to ascertain a particular fact, he ought himself to draw the conclusion from the evidence before him, and not merely to state the circumstances. (k)
Besides these masters in chancery, there are other standing officers of the Court of Chancery of England, whose duties are, in some respects, similar to those of masters, called Examiners, who are appointed by the master of the rolls. The office of the examiners is to examine, upon oath, the witnesses on both sides, that are brought before them in any case, as also parties in contempt ; and to put their answers and depositions in writing; which they are to keep close and private until publication. But if the witnesses reside more than twenty miles from the place where the court is held, then a commission issues to certain commissioners, nominated by the parties, who are authorized and directed, to take the depositions of such witnesses in private; which are returned and kept secret, until an order of publication is passed. The examination of witnesses was originally in chancery before the master of the rolls, who'was one of the judges of the court; and therefore, such examinations now by a master, by an examiner, or by commissioners,. must be considered as a delegation, by the court, of a part of its authority to them. (l)
*58 Considering the nature of the office and duty of a master in chancery, and recollecting, that the practice and course of proceeding of the Court of Chancery of England, had been generally adopted and followed by the Court of Chancery of Maryland, (m) it could not be deemed altogether unsafe, at once, to assume, that all the powers and duties of a master in chancery in England, so far as they were, in any way, subservient to the proper exercise of this court’s jurisdiction, as a Court of Equity, had devolved upon, and did now, in fact, belong to the auditor of this court. For, whatever may be his appellation or denomination, it is obvious, that the assistance of an officer, invested with authority to collect testimony, to make investigations, calculations, and statements of accounts, and to put in order the various materials, of which complex cases in equity are composed, is as indispensably necessary to the cheap and expeditious administration of justice by a Court of Chancery, as that of an examiner, or of commissioners clothed with no other authority, than that of taking and returning the depositions of witnesses.
It appears, that until some time after the year 1699, when the seat of government was removed to Annapolis, the High Court of Chancery, which was directed to be held at the same place, (n) was constituted of a plurality of judges; most or all of whom, certainly the Chancellor, were members of the Court of Appeals, the tribunal of the last resort of the province, (o) and consequently as the two courts could not well be in session at the same time, the same room, in the State House, was appropriated, by the legislature, to the use of both courts, (p) which general arrangement, as to the apartment in the public buildings appropriated to their use, after they were brought to Annapolis, was continued, and has by usage been kept up ever since; (q) although, by the Constitu *59 ,tion of the state, the two tribunals have been organized as totally distinct courts. While the Court of Chancery, under the provincial government was constituted of a plurality of judges, it transacted business only from term to term, and was not always open, as it now is. (r) About, or soon after the year 1714, the constitution of the court seems to have undergone some changes, of which there is no clear or satisfactory explanation to be found among its own records, or in the legislative enactments of the times. But some short time after the year 1719, it seems to have been finally settled, that the High Court of Chancery of Maryland, like that of England, should be considered as always open. (s)
It appears, that there were a number of officers called assistants, masters in chancery, examiners or auditors, appointed to assist the court in the discharge of its various functions. And, for some time, two of those masters were appointed, as in England, to sit, by turns, in court with the Chancellor as his assistants, during each term. (t) But, as it is said, in a case brought before the court, when the Chancellor was sitting with two of those assistants, that he had then no lawyers to aid him with their advice : it would seem, that those assistants or masters in chancery, were mere clerks ; or persons unlearned in the law, as a profession, and whose knowledge extended to nothing more than to matters of practice, connected with the ministerial affairs of the court, (u) In *60 one of the record books of chancery proceedings, it is set forth, that, at a Court of Chancery held at the city of Annapolis, on the 18th day of July, 1721, there was present: ‘ His Honor, William Holland, esq., Chancellor, who ordered the docket of causes tobe called over, which was accordingly donetaking no notice in that, or in any subsequent record, of there being present at that, or any other term thereafter, any other judge or assistant sitting with the Chancellor. (w) From which it appears, that the court, about that time, ceased to be constituted of a plurality of judges ; that masters or assistants, as in England, never thereafter sat in court with the Chancellor; and that, from that time, the High Court of Chancery of Maryland has always been, as it is at present, constituted of the Chancellor alone, as its sole judge.
In England, a master in chancery, and an examiner, are distinct officers; but it appears, that here, the powers and duties of the two offices were, by a commission from the Chancellor, conferred upon the same person, who was expressly invested with all powers and authorities, practised or exercised by any such officer of the Court of Chancery of England, (x) Exceptions to the sufficiency of the *61 answer of a defendant might, as at present, be at once brought before the Chancellor; but they were formerly most usually, as in England, referred to a master, or to a person specially authorized to act as such. (y) The depositions of witnesses might be taken before a master or examiner, (z) or the case might be referred to a *62 master to examine evidences more fully to illustrate its nature, or to supply some defect in the proofs, (a) A case might be referred to a master to state any account between the parties, or to make any inquiry or statement, deemed necessary by the court, in relation to which he was authorized, as in' England, to call before him and examine witnesses upon oath; a case might be referred by a special order to persons therein named, as a kind of special masters, who were thereby virtually clothed with the authority of a master, (b) But owing, as it would seem, to the generally *63 dispersed situation of witnesses; to the convenience of having their examinations taken,at or near their respective residences; and *64 to there being few cases in which all the witnesses were to be found in, or could be brought before a master in Annapolis, where the *65 masters resided, and where the court was held, it was most usual to have the account stated by commissioners, under a commission *66 to audit accounts. Such commissions were very common under the provincial government; and may now be issued in any case. *67 in which circumstances may render it necessary or proper, (c) It appears to have been always understood, as well settled, that *68 a commission to audit accounts, clothed the commissioners with all the powers properly belonging to a master in Chancery, under a similar reference, by an order or decree to account; except that here, under a reference of a case to a master, by an order or decree, or to commissioners by a commission to account, the depositions of witnesses were never taken secretly, as before a master in England, or as formerly here, under an ordinary commission to examine evidences; but always, as now, after notice to the parties, the witnesses were examined publicly in the presence of the parties, if they chose to attend. And testimony might be so taken after publication had passed, as to the depositions of witnesses taken under an ordinary commission, (d) It appears to have *69 been common in all cases, where there were any peculiar circum *70 stances, as to -which the court required information; or where the *71 account was to be stated in a particular way, for the Chancellor to *72 give special directions to the master, to the commissioners, or to the persons to whom the case was sent. (e) All reports of a *73 master, of a special master, and of commissioners to account were *74 subject to exceptions ; which were required to he taken and filed within a limited time. (f)
The legislature of the republic has authorized the Chancellor to appoint, during his pleasure, a person of integrity, judgment and skill in accounts to be auditor for the Court of Chancery; and has also declared, that all accounts directed by the Chancellor to he stated, shall he referred for such purpose to the auditor, who shall have authority to administer an oath to all witnesses, and persons proper to be examined upon such account; and shall state such accounts agreeably to the order of the Chancellor, and return the same, to he done with as the Chancellor shall think just. (g)
But there is nothing in that, or in any other legislative enactment which either expressly, or virtually withholds from the auditor any other authority which necessarily, or properly belongs to his office; or which abrogates any powers or duties which had been assigned to masters in Chancery, to commissioners to audit accounts, to an auditor, or to any other similar officer, whose assistance the Chancellor had found to he useful, or indispensably' necessary to the proper exercise of his jurisdiction. Conse *75 quently, this legislative enactment, so far as it goes, can only be regarded as an affirmance of the pre-existing powers of the Chancellor. And this court has, in many cases, since the passage of that law, assumed the position, that it was in fact nothing more, so far as it went, than an affirmance of its preexisting powers; it has, where occasion required, issued a commission to audit accounts; it has referred cases to persons with directions to perform duties properly belonging to a master in chancery or auditor, considering them as special auditors; and it has, in various instances, treated the auditor as a standing officer of the court, clothed with powers analogous to those of a master in chancery in England; and with all such powers as had been formerly understood to belong to a master in chancery here. (h)
In fine, deeming it to be entirely within the legitimate scope of the auditor’s powers to make any inquiry, to take testimony, to state any account, or to frame any statement wffiich may be necessary or proper to enable the court correctly to dispose of any case in which it has the power to grant relief, I shall send this case to the auditor, with such instructions accordingly.
Ordered, that this case be and the same is hereby referred to the auditor, with directions to report the whole value of the land *76 in the proceedings mentioned; the annual value thereof since the death of the testator; and by whom, if by any one,- the rents and profits thereof have been received, and the amount thereof; the amount of the arrearages of the annuity with interest; and the age and general state of health of the plaintiff Anna Maria Townshend ; and that the auditor make his statements and report as to these particulars, from the proceedings and such proofs as may be laid before him. And it is further Ordered, that the parties be, and they are hereby permitted, to take the depositions of witnesses to be read in evidence, in relation to the matter of this order, before any justice of the peace, on giving three days notice as usual to the opposite party or his solicitor.
On the 25th of May, 1829, the auditor reported, that in execution of this order, and at the instance of the solicitor for the complainants, he issued notice to the parties, that he would attend at his office in Annapolis, on the first day of August then next, to receive such evidence in relation to the matters in dispute, as the parties should then produce before him, &e. The proof of service thereof on the defendant Robinson, was therewith filed. The counsel for the plaintiffs filed the following interrogatories, &c. And Samuel Harrison of John, a witness of lawful age, produced on the part of the complainants, being duly sworn and interrogated, deposed, &c. The auditor attended pursuant to the last adjournment; and neither party appearing, he adjourned sine die. That the complainants had since filed with him the deposition of John Hanan relative to the age and state of health of the complainant Anna Maria; and also their admission of the payment of three years annuity which were returned.
The auditor further reported, that upon consideration of the said testimony, and other the proceedings in the cause, the whole value of the land, in the proceedings mentioned, was $2,983 50, or thereabouts. That the annual value thereof, at the time of the testator’s death, and for five years thereafter, was $200; and since that time to the present, $150. And that the average annual *77 value thereof, from the death of the testator to the present time, might be estimated at $175. That said land remained in possession of Deborah Duncan, the deceased’s widow, from his death, on the 4th of March, 1819, to the latter end of 1824, the time of her death, say for the space of six years. There was no evidence of the amount of rents and profits actually received during this-period. The value thereof, according to the proofs, might be' estimated at $ 1150. That from the death of Deborah Duncan, the rents and profits of the said land had been received by the defendant Joseph Robinson. And the value thereof, to the 4th of March, 1829, might be estimated at $600. That Mrs. Duncan discharged the annuity to the 4th of March, 1820; and the defendant Robinson had paid the annuity for the years ending respectively on the 4th of March, 1826 ; 4th of March, 1827; and 4th of March, 1828» The complainants, therefore claim their annuity from the 4th of March, 1820, to the 4th of March, 1825,- and from the 4th of March, 1828, to the 4th of March, 1829; six years, at $60, being $360; and interest on each year as it became due, amounting to $112 86; being in the whole, $472 86. And that the plaintiff Anna Maria Townshend, was aged thirty-three years, or thereabouts, and enjoyed good health.
The defendants excepted to this report, first, because the auditor had not allowed to the defendants all the credit to which, by the evidence in the cause, they were entitled; especially the sum of $20, admitted to have been paid by the late Mrs. Duncan over and above the amount credited to her, by the auditor in his account; second, because there was no evidence whatsoever in the cause, duly and regularly taken, according to the course of chancery proceedings, by which the said defendants can, in any wise, be charged or affected, or any decree passed against the infant defendants and Robinson, or touching or concerning the interest of said infants or said Robinson in the land in the bill mentioned, or otherwise; and thirdly, because the said report and accounts are in other respects erroneous.
After these exceptions had been filed, the plaintiffs admitted, that the late Deborah Duncan had paid $20, which had not been credited by the auditor.
On the 25th of July, 1829, the infant defendants William and Caroline, by their next friend, filed their petition, in which they stated, that they could prove that Deborah Duncan had been appointed guardian for them by the Orphans Court of Anne Arun *78 del county, and had received the rents and profits of the said land for six years; but had never accounted with the Orphans Court, as guardian, for any other sum of money than the balance remaining, after deducting from the gross amount of rents and profits, the sum of $60 per year. Whereupon they prayed, that a commission might be issued; or some order passed to enable them to obtain the benefit of the .said testimony, &c. ' -
Upon which the Chancellor expressed a wish to hear counsel; and for that purpose Ordered, that the matter should stand over until further order. But the matter was not again moved on behalf of the infant defendants.
12th August, 1829.
Bland, Chancellor.
This case standing ready for hearing, and having been submitted on notes by the solicitors of the parties, the proceedings were read and. considered.
It was the well settled practice of the. Court of Chancery of Maryland, under the provincial government, and has continued to be so ever since the establishment of the republic, without any doubt or interruption, that in all cases where an account was required by the court, or the parties, a special commission might issue, directing the commissioners to take testimony; ‘and also to state, audit, settle, and adjust all accounts relating to the matter in dispute, that should be produced to them;’ and to reduce into writing such account; and to return the same, with the depositions of the witnesses, (i) The act of assembly which authorized the court to appoint an auditor, does not, in any respect, impair or abrogate the previous ancient practice1; and therefore, special commissions, calling for the return of an account along with the proofs, have often been issued since the passage of that act. (j)
Hence, as the court might clothe commissioners, appointed to take testimony, with authority to state an account from the proofs collected by them; and as it appears that formerly, when1 a case was referred to a master to take the depositions of witnesses, upon oath; so it has been held, ever since the passage of the act of assembly authorizing the appointment of an auditor, that when a case is referred to the auditor, by any interlocutory .decree to account; or by an order directing him to state an account, or make estimates, as in this instance, from the proofs then in the case, and such other proofs as may be laid before him, such a reference in itself clothes him with the power properly belonging *79 to such an officer according to the ancient course; as if the case had been referred to a master in chancery, or a special commission had been issued to take testimony and state an account: -which, indeed, it is conceived, has been virtually affirmed by the act of assembly directing the appointment of an auditor, and authorizing him to administer an oath to all witnesses and persons proper to be examined upon such account. (k) Consequently, all the testi *80 mony collected and returned by the auditor in this case has been taken according to the long and well established course of the court.
*81 With regard to the taking of testimony under the authority of a special order of the court, before a justice of the peace, I have not *82 been able to ascertain the origin of the practice; but it seems to have prevailed from an early period of the provincial government; *83 and appears to have been at all times, and very commonly resorted to since the revolution; (l) and the court has gone so far as to compel a witness to submit to an examination before a justice of the peace, where testimony had been directed by an order to be so taken, (m) This mode of collecting testimony, it is believed, is *84 peculiar to our chancery proceeding, for I have met with no mention of any such practice in the English books. It is, however, *85 not only In some respects, the cheapest form of gathering proofs, but, in many instances, it greatly facilitates, and expedites the progress of the cause. Depositions so taken, it is evident, are made under all the principal safeguards, which can, in any manner, insure fairness and fulness of evidence; that is, the special order of the court indicating the matter in issue, on oath, publicity, the right to cross-examine, and a penal responsibility. It may, therefore, be as confidently relied on as testimony taken in any other way; being in no manner open to the strong objections to that kind of ex parte, affidavit evidence, to which the Court of Chancery of England allows itself to resort, for the determination of some of *86 the most delicate and important cases that are brought before it. (n) It is upon these grounds, that I think this mode of taking testimony deserves the continued sanction, approbation, and protection of this tribunal, (o)
The testimony taken under the order of the 21st of February, 1828, before a justice of the peace, has therefore, been brought in according to the regular course of the court.
The will of the late William Duncan, it appears, has been proved and recorded, according to the act of assembly, which declares, ‘that it shall and may be lawful for the judge of probate of wills to take the probate, or cause to be proved any last will or testament within this province, although the same concerns titles of lands;’ (p) which for this purpose is still in full force. A probate so made of a will devising real estate, it has always been held, is at least prima facie evidence of its validity; (q) and there being in this case, no allegation or evidence, which, so far questions the validity of this will, as to throw the burthen of sustaining its verity upon the plaintiffs; and these infant defendants as well as the plaintiffs claiming under it, the certified copy offered must be considered as sufficient, for all the purposes for which it is produced.
From the pleadings and proofs it-is very clear, that this will cannot be so construed, as to authorize a sale of the real estate for *87 the purpose of raising or securing the payment of this annuity; nor can it be construed to give the plaintiff Anna Maria an estate for life, or any other lesser estate in the lands charged with the payment of the annuity. These infant devisees could only take this estate subject to the charge upon it, and the annual rents and profits, as it is now shewn, so far exceed the annuity in amount as to demonstrate, that it is much to their benefit so to take it. And consequently, all their property, in respect of this large amount of assets thus placed in their hands, and which they have taken, must be held liable for the payment of this annuity.
For the arrears which accrued since the death of the testator, and were left unpaid by Deborah Duncan, the late guardian of these infants, her sureties as guardian, if she gave any, or her legal representatives may be held liable; but their estate is liable to these plaintiffs, to whom the sureties or legal representatives of the late Deborah Duncan can, perhaps, be in no way held accountable; certainly not in this suit. The present guardian of these infant defendants, Joseph Robinson, not having answered; and having thereby tacitly admitted, that he had received a sufficiency of rents and profits from his ward’s estate, must be held absolutely liable for the whole amount of the annuity which has accrued and been left unpaid, during the time of his guardianship. For the purpose of having a statement made upon these principles, the case must be again sent to the auditor.
Ordered, that this case be, and the same is hereby again referred to the auditor, with directions to state an account, shewing the amount of the arrearages of the said annuity which became due during the life time of the late Deborah Duncan ; after giving her credit for the sum of $20, as of the year 1821, in addition to the credits heretofore given. And further, to state an account of the amount of the arrearages of the said annuity, left unpaid by the present guardian, the defendant Joseph Robinson.
On the 13th of August, 1829, the auditor reported, that he had in obedience to this order, again examined the proceedings, and stated, first, an account between Deborah Duncan, deceased, and the complainants, in which was charged the arrearages of the complainant’s annuity to the supposed time of Deborah Duncan’s death. That the proof was, that she died in the latter end of the year 1824; upon which he had assumed, as a mean period, the 4th of October of that year. That he had allowed a credit for *88 $20, paid on account of the annuity accrued on the 4th of March, 1821, agreeably to the said order. That interest was charged on the annual arrearages from the 4th of March of each year. And that the sum due to the complainants, was $354 16, with further interest on $255, part thereof, from that date until paid. And secondly, an account between Joseph Robinson and the complainants, of arrearages accrued since the death of Deborah Duncan. That interest was there also allowed on the annual arrearages, as in the first account. And that there appeared to be due to the complainants on this account, the sum of $93 26, with further interest on $85, part thereof, from that date until paid. Upon which report the case was submitted by the solicitors of the parties for final adjudication.
nth August, 1829.
Bland, Chancellor.
Decreed, that the said bill of complaint be and the same is hereby taken pro confesso, as against the defendant Joseph Robinson. And it. is further Decreed,, that the infant defendants Caroline Duncan and William J. B. Duncan, or the said Joseph Robinson as their guardian out of the estate and property of his said wards, now in his hands, or which may hereafter come into his hands, pay unto the plaintiffs Perry Townshend and Anna Maria his wife, or bring into this court to be paid to them, the sum of $354 16, with interest on $255, part thereof, from the 13th instant, until paid or brought in. And it is further Decreed, that the said Joseph Robinson also pay unto the plaintiffs Perry Townshend and Anna Maria, his wife, or bring into this court to be paid to them, the sum of $93 26, with legal interest on $85, part thereof, from the 13th day of the present month, until paid or brought in; together with the costs of this suit, to be taxed by the register; the same to be paid by the said Robinson, out of the assets of his said wards in his hands, if any there be, if not out of his own proper estate , and effects. And it is further Decreed, that the several reports of the auditor, heretofore made in this case, so far as they accord with this decree, be and the same are hereby confirmed; and so far as they are at variance with this decree, they are hereby rejected. And it is further Decreed, that the said complainants’ bill of complaint, as against the defendant John Iglehart, be and the same is hereby dismissed with costs, to be taxed by the register.
Appeal. — See the decision of the Court of Appeals, 3 Gill and John, 413.

 It is declared that wherever a subpoena shall be returned summoned, as to all or any of the defendants, making no distinction in favour of infants, the court must enter an interlocutory decree, &c. 1820, ch. 161, s. 1.

 1820, ch. 161, s. 5.

 Chicot v. Lequesne, 2 Ves. 318; East India Company v. Henchman, 1 Ves. jur. 289; Wheeler v. Trotter, 3 Swan, 174, n.; Gordon v. Gordon, 3 Swan, 472; Barfield v. Kelly, 3 Cond. Chan. Rep. 703; Topham v Constantine, 5 Cond. Chan. Rep. 322; Brice v. Bletchley, 6 Mad. 17; Edney v. Jewell, 6 Mad. 165; Cuthhert v. Creasy, 6 Mad. 189; Flint v. Field, 2 Antr. 543; Hall v. Maltby, 2 Exche. Rep. 463; Carew v. Johnston, 2 Scho. and Lefr. 280; Lingan v. Henderson, 1 Bland, 236,

 Holloway v. Mellard, 1 Mad. Rep. 421, (229.)

 Elliot v. Hancock, 2 Vern. 143; Attorney-General v. Downing, Amb. 571.

 Ratcliff’s case, 3 Co. 38; Roach v. Garvan, 1 Ves. 158; Mellish v. De Costa, 2 Atk. 14; Smith v. Marshall, 2 Atk. 70; The King v. Oakley, 10 East. 494; 2 Fonb. 238; 1 Blac. Com. 461.

 Co. Litt. 88; 2 Fonb. 243; Hay v. Conner, 2 H. & J. 347: Brodess v. Thompson, 2 H. & G. 120; 1798, ch. 101, Sub. Ch. 12;

 Gregory v. Mighell, 18 Ves. 331; Parker v. Mackall, pos. note.
Cox v. Callahan. — This bill was filed on the 15th of December, 1790 — It states that the plaintiff, while an infant, became seized of a certain tract of land as devisee of his late father; that his mother was entitled to dower therein; that she married John Hailey, who afterwards became the guardian of the plaintiff; that Hailey held the land to which the plaintiff was entitled, and took the rents and profits, but never paid or accounted for them; that he made his will, and appointed the defendant Chaires his executor, who received the then crop of the plaintiff’s land; that the lands of which John Hailey died seized, descended to his heir Charles Hailey, who devised them in part to the defendant Benton, and in remainder and wholly to the defendant Callahan, whom he appointed his executors and died; that John Hailey’s personal estate was insufficient to pay his debts; and that neither he, in his lifetime, nor any of the defendants since, have paid or accounted to the plaintiff for the rents and profits of his lands. Prayer for an account, and for general relief.
The defendants answered, proofs were taken, and the case was thereupon brought before the court.
25th January, 1793. — Hanson, Chancellor. — This cause standing ready for hearing, and being submitted to the Chancellor without argument, the bill, answers. *52 depositions, exhibits and other proceedings were by him read and carefully considered. And the matters stated in the bill appearing to him to be true; and he thereon being of opinion, that the complainant is entitled to an account of the profits of his real estate, whilst in the hands of his guardian John Bailey, notwithstanding the valuation thereof by appraisers, and to an account also of the profits, whilst the said estate was in the hands of the said Bailey’s executors ; and that the amount of the said profits, after deducting the expenses of maintaining and educating the complainant, and the taxes and other just charges, if any, on the land aforesaid, together with interest on the balance from the time of the complainant’s arrival at full age, ought to be paid to him, out of the personal estate of the said Bailey, or if that estate be insufficient, out of the real estate which hath descended from the said Bailey.
It is thereupon Decreed, that the defendant John Chaires do, on oath, account with the complainant for two-thirds of the profits of that part, containing three hundred and seventy-five acres of a tract of land, called Low’s Arcadia, which was devised. by Christopher Cox, father of the complainant, from the 27th day of September, 1781, and for the whole of the said profits from the 7th day of February, 1785, until the end of the year 1786, deducting thence all sums expended by the said Bailey in the maintenance, support and education of the complainant: and his proportionable part of all taxes paid for the said land whilst in the possession of the said Bailey, or his executor; and also for interest on the balance from the 2d day of September, 1787, that being the day whereon the complainant attained his full age as aforesaid.
And it is further Decreed, that the auditor state the said account, and that, in so doing, he state the yearly value of the land to be so much as it is proved the said Bailey rented out the same for during one year, deducting a reasonable allowance for the articles belonging to the said Bailey, which were let to the tenant along with the land; and that the auditor likewise take an account of the personal estate of the said John Bailey, or assets which have come to the hands of the said John Chaires; and the disbursements of the said Chaires, as executor of the said Bailey; and that the auditor report the said accounts, subject to the exceptions of the parties, and to be done with as to the Chancellor shall seem just and proper.
The auditor made a report accordingly, by which it appeared, that the executor Chaires had overpaid, and that the personal estate of John Bailey deceased, was exhausted. Upon which the case was again brought before the court.
20ft December, 1793. — Hanson, Chancellor. — On motion of the complainant it is Ordered, that the report of the auditor, and the account by him stated, agreeably to the interlocutory decree, be taken and considered as a'ground for the relief prayed, and for making the lands which have descended from the said Bailey, and which are in the hands of the defendant Thomas Callahan, answerable for the deficiency of the personal estate of the said Bailey; unless the contrary be shewn by the said Callahan on or before the first Tuesday in February next; provided a copy of this order be served on the said Callahan before the twenty-fifth day of January next.
A copy of this order having been served as required, and no sufiicient cause having been shewn, the case was submitted, without argument, for a final decree.
23d June, 1794. — Hanson, Chancellor. — The said cause standing ready for final decision, and being submitted, and the bill, answer, exhibits, auditor’s report, and all other proceedings being by the Chancellor read and considered:
*53 It is thereupon Decreed, that unless the defendant Thomas Callahan shall pay unto the complainant Christopher Cox the sums stated by the auditor to be to him due, amounting to £282 19s. Od. current money, with interest thereon from the 22d of March, 1787, the several tracts of land called Good Increase, Hailey’s Hazard, Hailey’s Chance, and part of a tract of land called Shetland, supposed to lie in Queen Ann county, or such of them as descended from the aforesaid John Railey unto Charles Railey, and have, by the said Charles Railey, been devised unto the defendant Thomas Callahan, shall be assets in the hands of the said Callahan, and shall be subject to execution from this court for the payment of the said sum, with interest as aforesaid from the 22d day of March, 1787. And also for the payment of the legal costs expended by the complainant in the prosecution of this suit, amounting, as taxed by the register, to 'the quantity of 5201 pounds of tobacco. And it is further Decreed, that the defendants John Chaires and Mark Benton be hence dismissed.

 Attorney-General v. Downing, 1 Dick. 417; Nannock v. Horton, 7 Ves. 402; Sibley v. Perry, 7 Ves. 534.

 William Clun’s case, 10 Co. 128 ; Co. Litt. 144; Brediman’s case, 6 Co. 59.

 Co. Litt. 143; Brediman’s case, 6 Co. 59; Saward v. Anstey, 9 Com. Law Rep. 506; Rebecca Owings’ case, 1 Bland, 296.

 Thorndike v. Allington, 1 Chan. Ca. 79; Davy v. Davy, 1 Chan. Ca. 147; Kennoule v. Bedford, 1 Chan. Ca. 295; Bath and Mountague’s case, 3 Chan. Ca. 91; Sherman v. Collins, 3 Atk. 319; Nicholls v. Leeson, 3 Atk. 574; Leeds v. New Radnor, 2 Bro. C. C. 339 and 519; Cupit v. Jackson, 6 Exch. Rep. 245.

 Thorndike v. Allington, 1 Chan. Ca. 79; Elliot v. Hancock, 2 Vern. 143.

 Com. Dig. Lit. Chancery, 3 R. 3.

 Teynham v. Webb, 2 Ves. 206.

 Stapilton v. Stapilton, 1 Atk. 6; De Manneville v. De Manneville, 10 Ves. 59; Still v. Hoste, 6 Mad. 192.

 Ivy v. Gibert, 2 P. Will. 19; Colpoys v. Colpoys, 4 Cond. Chan. Rep. 210.

 1785, ch. 72, s. 17.

 1 Harri. Prac. Chan. 73.

 Abraham v. Alman, 1 Russ, 509.

 Wilson v. Mount, 3 Ves. 191; Radnor v. Shafto, 11 Ves. 454.

 Wilson v. Townshend, 2 Ves. jun. 696; Ebrington v. Ebrington, 5 Mad. 117; Gretton v. Haward, 1 Swan. 413.

 Jones v. Collier, Amb. 731.

 Pauncefort v. Lincoln, 1 Dick. 362

 Chicot v. Lequesne, 2 Ves. 318 ; Edney v. Jewell, 6 Mad. 165.

 Parkinson v. Ingram, 3 Ves. 605. 605.

 Potinger v. Wightman, 3 Meriv. 68; Toosey v. Burchell, 4 Cond. Chan. Rep. 73; Brown v. De Tastet, 4 Cond. Chan. Rep. 135; Cook v. Collingridge, 4 Cond. Chan. Rep. 286

 1 Newl. Pra. 330.

 Beam’s Ord. 285.

 Parkinson v. Ingram, 3 Ves. 603; Forum Rom. 109.

 Beam. Ord. 220.

 Dick v. Milligan, 2 Ves. jun. 24; Jenkins v. Briant, 9 Cond. Chan. Rep. 427.

 Marlborough v. Wheat, 1 Atk. 454.

 Cook v. Collingridge, 4 Cond. Chan. Rep. 293;

 Anon. 2 Atk. 621

 Lee v. Willock, 6 Ves. 605.

 Forum Rom, 124; 1 Harr. Prac. Chan. 430, 482.

 Ringgold’s Case, 1 Bland. 18; 2 Bozm. Hist. Md. 131.

 1699 ch. 19.

 The Chancellor’s Case, 1 Bland. 624. ‘At a court held for the chancery and provincial court, begun on Tuesday, the 30th day of December, in the 39th year of the dominion of Cceciiius, absolute lord and proprietary of the province of Maryland and Avalon, &c. annoque Dom. 1670, and continued till the 17th, was present: the Right Hon. Charles Calvert, esq. lieutenant-general and chief judge in equity; the Hon. Phillip Calvert, esq. Chancellor; William Talbot, esq. secretary; William ■Calvert, Baker Brooks, Thomas Trueman, and Samuel Chew, esq’s. This day the Hon. William Talbot, esq. principal secretary, was sworn one of the justices of the provincial court and chancery, and took his place as secretary, next the Chancellor. Upon the 15th day, Edward Fitzherbert, esq. was sworn one of the justices of the provincial court and chancery likewise, and took his place accordingly.’ Chancery Proceedings, Ub. O. D. 26.

 1697, ch. 6, s. 3

 Resolution, 1836, No 60.

 Chancellor’s Case. 1 Bland. 624.

 Chancellor’s Case, 1 Bland, 624.

 ‘19th January, 1715. — Then his Excellency the Governor proceeded to settle and appoint the times for the sitting of the Chancery Court, as follows, viz: March the 10th, when Col. Coursey and Esquire Hall are appointed to sit as assistants. May the 18th when Col. Lloyd and Col. Greenfield are appointed assistants. September the 1st, Col. Tilghman and Esquire Dorsey appointed assistants. December the 1st, Col. Young and Col. Addison assistants. And ordered that the said gentlemen have a month’s notice given them before it be their turn to sit at the several courts as above appointed.’ — Chancery Proceedings, lib. P. L.fol. 85.
Griffith v. Vernon, 1716. — In this cause the report of the auditor is approved of, and Decreed, that the defendant account and pay to the complainants their jnst proportions of the sum found in arrear, with costs; and as to the mesne profits, he is referred to his proper remedy; and that the amendment in the former decree be to those of whom it of right belongs by the deceased Lewis Evan’s will. — Chancery Proceedings, lib. P. L. fol. 291.

 Birchfield v. Miller. — September 3, 1717. — John Hart, Chancellor.— William Holland and Samuel Young, assistants. The Governor and Keeper of the Great Seal declares, that being doubtful of his own judgment in determining the point of law now in debate between the complainant and defendant, and having no lawyers to aid him with their advice, but what are already concerned in this cause, he humbly desires the opinion of some of his majesty’s judges in the courts *60 of Westminster, or any two persons learned in the laws of Great Britain; and that the aforesaid opinion be procured and returedin some convenient time. — Chancery Proceedings, lib. P. L. fol. 387-394. Answers were accordingly obtained from the Attorney-General of England. — Ibid. fol. 418.

 Chancery Proceedings, lib. P. L. fol. 650-690-720.

 ‘Maryland, ss. Samuel Ogle, Esquire, Chancellor of the province of Maryland,
To Benjamin Young, oí the city of Annapolis, gentleman, Greeting: ‘Having special trust and confidence in your fidelity, integrity, knowledge and circumspection, I do hereby nominate, constitute and appoint you, the said Benjamin Young, to be examiner and master in the High Court of Chancery, to taire the examinations and depositions of witnesses, as to the facts in issue in all causes depending, or hereafter to be commenced in the said court; and also to take all accounts decreed; to report all matters of fact referred to you; and to take all affidavits, and probats of answers in the same court. — Hereby giving and granting unto you, full power and authority to act, do, perform and execute all and singular the powers and authorities as are practiced or exercised by any such officer of the Court of Chancery of England, so far, as in the judgment of the Chancellor, for the time being, the circumstances of the Court of Chancery of this province will admit; and to ask, demand and receive all such fees, perquisites and rewards as shall be by the Lieutenant Governor of the said province, for the time being, thought just and reasonable. — To have and to hold the said office of examiner and master during pleasure. Given at the city of Annapolis, this 8th day of October, in the 21st year of his lordship’s dominion, &c. Anno Domini 1734.’
‘11 th October, 1734 — Sedente Curia — Ordered, that the following oath be taken by Benjamin Young, Esq. as master and examiner in this court; and that the said oath be entered among the records of this court, as the oath of office of master and examiner for the future.’
*61 ‘You shall swear, that well and truly you shall execute the office of master in chancery to which you are called; you shall also well and truly, after your cunning and learning, execute the office of examiner in the Court of Chancery whereunto you are admitted; and you shall duly, justly, and equally examine the causes, that shall be committed unto you, without any favour, or corruption of any person or persons to be had or done, otherwise than of right shall appertain concerning the same; and you shall be attendant to further the same causes, from time to time, as need shall require; and you shall not publish, or shew the same depositions to any per» son before publication in the court, without the warrant of the same court — so help you God.’
‘Fees settled and allowed by his excellency, Samuel Ogle, Esq. Chancellor, to Benjamin Young, Esq. master and examiner in this court, and to all succeeding masters — for every oath to an affidavit, or probate of an answer, one shilling — for every oath administered to any witness examined by him, one shilling — for every examination of a witness, and report made on any matter referred to him, and returned; for every side, computing seven words in a line, and twelve lines in a side, one shilling and four pence — for every day on which he shall be attended, and proceed in the settling any matter of account referred to be taken by him, ten shillings.’ — Chancery Proceedings, lib. J. R. No. 2.fol. 625, 633.

 Murdock v. Haddock — 1713—Ordered, that replication or exceptions be filed by next court. — 1714—Exceptions to the answer referred, to be argued before Col. Young to make his report. — 16thDecember, 1714 — Ordered, thatMr. James Haddock’s answer to the interrogatories to him put concerning Thomas Coutts, Patrick Andrews, and others, be referred to Col. Samuel Young, master in chancery, for hearing.
October, 1716. — Hart, Chancellor. — Upon reading the answer and exceptions taken thereto; and upon hearing this cause, Ordered, that the first and second articles relating to that part of the answer be amended; and the third exception agreed, and the answer to be amended in that particular. And Ordered, that the defendant pay to the plaintiffs six hundred pounds of tobacco, being the costs for the delay, awarded them.’ — Chancery Proceedings, lib. P. L.fol. 13, 70, 86, 318.
‘Present, his excellency, the keeper of the great seal of Maryland.
14Í& July, 1716. — By the Court of Chancery. — Upon the motion of Samuel Young, Esq. one of the assistants in this court, that many references are made to him ; and especially of exceptions taken to answers, and other proceedings in this court, which, in obedience to the court, he is obliged to expedite, and hear, and report ; although there is no settled fee, or other reward allowed and ascertained to him for such services. It is Ordered and ruled by this court, that the said master-assistant, or other gentleman, acting as such on those occasions, and to whom such references are made, be paid and satisfied, either by the complainant or defendant, in whose favour the said referee’s report shall happen to be made, the sum of twenty-shillings current money, for such report, before he or they be obliged to make and give in his or their report.’ — Chancery Proceedings, lib. P. L.fol. 302.

 ‘May, 1735. — Buled and ordered, that in all causes now depending, wherein commissions have issued, but are not returned, the examinations may be taken by *62 the examiner and master of this court, as well as in causes wherein no commissions have issued, saving to the parties, in all cases, the liberty of examining any witness or witnesses, who, by reason of age Or infirmity cannot attend the examiner, In order to be examined, as if this rule had not been made.’
‘October, 1735. — Ruled and ordered, that in all causes which are now, and shall be hereafter referred to the examiner for the examination of witnesses; publication of the depositions do pass, within six months from the court wherein such reference is made ; unless an order be made for enlarging publication to any particular time; and if no depositions be taken on either side within the six months, then hearing to be on bill and answer the next court after.’ — Chancery Proceedings, lib. J. R. No. 2,fol. 649, 681.

 The Proprietary v. Bordley. — December, 1735. — Information, Hammond’s plea, demurrer and answer; Jening’s plea, demurrer, and answer; Donaldson’s, Duff’s, Alexander’s, and Cuming’s special replication filed to the said answers. General replication and rejoinder: Gordon’s and Bullen’s answer, Bordley’s answer, McCleod’s answer.
Ogle, Chancellor. — Ordered, that warrant of resurvey issue at the instance of the defendants directed to Mr. Henry Ridgely, and that the said warrant be returned by next court. Upon motion, Ordered, warrant of resurvey issue directed to Mr. Henry Ridgely and William Cromwell, or either of them; and that either party give the other notice of executing the said warrant.
May, 1736. — Replication to Bordley’s answer filed; warrant of resurvey returned; William Cuming on behalf of himself, and as counsel for sundry defendants in this cause, prays leave to except to the return of the warrant of resurvey, directed to Henry Ridgely, with the plot of the complainant’s pretensions, because, that the surveyor did proceed to lay out and plot the lands before there was any proof of the bounds.
Ogle, Chancellor. — The motion being considered, this court doth declare, that the above is not any good exception to the return made by the said Ridgely. Referred to the master to examine evidences.
October, 1736 — William Cuming, Esq. on behalf of himself, and as attorney of William Alexander and James Donaldson, who all claim under a purchase from Kingsmill Eyre, the devisee of governor Nicholson, part of the land in dispute, by the name of the Vineyard, prays, that he may have leave to return a plot of the said land called the Vineyard, with their pretensions thereto; which is granted accordingly.’ — Chancery Proceedings, lib. J. R. No. 2, fol. 684, 720, 759,769.

 Cheseldine v. Gordon, post.
Parker v. Mackall — This bill was filed on the 20th of January, 1734, by *63 Gabriel Parker, against John Mackall. It states that the plaintiff’s father, George Parker, made his last will, appointing his wife Susannah, the plaintiff’s mother, his executrix, and died on the 4th of March, 1710, possessed of a great personal estate and seized of a considerable real estate, great part of which descended to the plaintiff as heir at law, who was then about twelve years of age; that the said Susannah, took upon herself the office of executrix, and returned an inventory; and afterwards married the defendant, by virtue of which he possessed himself of all the real and personal estate of the plaintiff’s; and also got into his possession several lands and personal property of the plaintiff’s, consisting of money and slaves, one of whom was an expert carpenter and cooper, which had been devised and bequeathed to the plaintiff by his grandfather, Gabriel Parrott. That the plaintiff married at about sixteen years of age, and soon after demanded of the defendant the delivery of his estate, which the defendant refused to make; except some household furniture, two negroes, and twenty sheep, which were represented to have been delivered at their appraised value, although not worth so much then as when appraised; and yet the defendant, taking advantage of the plaintiff’s youth, by misrepresentation, actually charged him more than the amount to which it had been appraised. That the plaintiff had received from the defendant several sums of current money which he alleged were payments in sterling money; that after the death of the plaintiff’s father, there arrived here sundry goods from England, the property of the plaintiff, which came to the hands of the defendant, and were converted by him to his use; which goods then bore cent, per cent, and upwards, advance, but were inventoried by the defendant at the prime cost in sterling money; that the defendant had actual occupation, possession and advantage of all the plaintiff’s real and personal estate for live or six years before he came of age, of which the defendant made or might have made very great profit and advantage, and did not during all that time maintain the plaintiff, or make him the least satisfaction for such use and occupation of his estate. Upon which it was prayed, that the defendant might account for the personal estate, and for the rents and profits of the real estate, and the interest thereof; that he might make reparation for the waste and spoil committed by him on the plaintiff’s lands and improvements; and that the plaintiff might be otherwise relieved in the premises as should seem agreeable to equity.
At May court, 1735, the defendant exhibited his answer to the bill of complaint; and the same court the complainant filed exceptions thereto; which exceptions coming to be argued tire same court before the Chancellor, in presence of counsel learned on both sides.
Ogle, Chancellor. — This court doth declare, that the exceptions to the said answer are good, and the answer of the defendant adjudged insufficient, and Ordered, that the defendant pay the complainant six hundred pounds of tobacco for his delay. And it is likewise Ordered, that subpmna issue against the defendant for tile costs; and to put in a better answer to the aforegoing bill.
After which, at December court, 1735, the defendant filed his answer, in which he admitted, that George Parker, the father of the plaintiff, made his will and died as stated, leaving real and personal estate; that the defendant had married the widow; and also that Gabriel Parrott died leaving an estate as stated; but that the defendant had regularly and legally accounted for and paid to the creditors, legatees, and next of kin, all the personal property which had come to his hands; that the *64 household furniture, negroes and sheep, had been delivered to the plaintiff, -without any misrepresentation, at a fair valuation; that the mulatto fellow Ned, the property of the plaintiff was an ordinary carpenter and cooper, from whom the defendant received no other benefit than from an ordinary slave ; that the defendant had possession of the plaintiff’s personal estate for about five years and three months, that is, from the time of the defendant’s marriage with the plaintiff’s mother until he came of age, and paid the quit rents of his lands in St. Marys, but never during his possessing them, received any more than £13 18s. 3d. and 4376 lbs. of pork; that of the plaintiff’s lands in Anne Arundel a part was seated, whereon the defendant had negroes who were employed in making crops, and another part on which his overseer’s wife lived; but that this defendant never was at but one of the said tracts of land; that the plaintiff’s lands in Prince George’s, were not seated or ever seen by the defendant; that he does not know that there ever was any seated plantation on' the plaintiff’s lands in Baltimore county; that for the plaintiff’s lot in Huntingtown, the defendant had received the hire of about 1200 lbs. of tobacco; and that this defendant had a right to the occupation and profits of the plaintiff’s lands without accounting for the same.
At May court, 1736, the plaintiff put in a general replication to this answer, and the defendant rejoined; and so, the parties being at isssue, divers witnesses were examined and their depositions published according to the course of the court, the master in chancery made a return as follows:
‘In pursuance of an order of the Court of Chancery, bearing date the 25th day of May, in the year of our Lord 1736,1 have proceeded to examine Thomas Sanner of St. Mary’s county, planter, James Biscoe of the same county, planter, James White, of the same county, planter, John Gaines of Calvert county, planter, Josias Sunderland of the same county, planter, James Dukes of the said county, planter, Samuel Griflin of the same county, planter, Francis Gaines of the same county, planter, Walter Phelps of Anne Arundel county, planter, and Jonathan Taylor of the same county, planter, as witnesses for the complainant, whose examinations, together with the interrogatories filed by the complainant in this cause, hereunto annexed. I humbly return into this honourable court. B. Young, Master in Chancery.’
Here follow the depositions of sundry witnesses taken, as stated, before this master in chancery, which, as appears by his attestation to each, were taken at different times and places. At St. Mary’s county, the 20th day of April, 1737 — same place, 21st April, 1737. At Calvert county, the 17th day of September, 1737 — and at Annapolis, the 22d and 29th day of October, 1737 — upon all which the case was brought before the court.
2d June, 1738. — Ogle, Chancellor. — This case coming on to be heard and debated in presence of counsel learned on both sides, the complainant’s bill and the defendant’s answer, and the whole proceedings thereon being read, it appeared to be as’ before recited and set forth.
Whereupon this court doth Decree, that the defendant account for the rents and profits of the complainant’s real estate which the defendant received, and which were lost by his act and neglect; and also, for the profits which might have been made by the service and earnings of the mulatto man called Ned, mentioned in the proceedings ; and that all just allowances be made to the defendant for his disbursements on the complainant’s account, for which the defendant has not already received *65 satisfaction; and that the master take the account and the examination of such witnesses as may be necessary, and report the same to the court.
Pursuant to which-the master made his report, and certified the same into this court, as follows, viz:
The examination of Samuel Taylor of Prince George’s county, planter, taken before me by virtue of a decree of the High Court of Chancery, &c. Here follows the deposition of the witness, which it may be inferred from its not being said where taken, that it was taken and sworn to before the said B. Young, master in chancery, in Annapolis. Upon which the master reported in the following words:
. ‘In pursuance of a decretal order made in this cause, bearing date the 2d day of June last, I have been attended by the counsel for the complainant and the defendant in this cause; and the complainant having filed with me an account of his demand for the rents and profits of his real estate, which he suggested to have been received by the complainant, or lost by his act, or neglect; and also for the profits which might have been made by the service and earnings of the mulatto man called Ned, mentioned in the proceedings, the particulars whereof are set forth in the first schedule to this, my report, annexed. And the defendant having also filed with me an account of his demand for payments, and disbursements on the complainant’s account, for which he suggested, that he had not yet received satisfaction, the particulars whereof are set forth in the second schedule to this, my report, annexed; and having likewise examined such witnesses ns appeared to me necessary, I have proceeded to take the account.
'And I find, by the defendant’s own acknowledgement, that he had the management and possession of the complainant’s real estate, and the mulatto man called Ned, in the proceedings mentioned, for at least five years before the complainant came of age; and that the rents and profits of the complainant’s real estate, which lies in Saint Mary’s county, mentioned in the first five articles of the first schedule to this, my report, annexed, did, for the first of the aforesaid five years, amount unto the sum of 2600 pounds of tobacco; for the next of the aforesaid five years, to the sum of 2850 pounds of tobacco; and for the remaining three of the aforesaid five years, to the annual sum of 3600 pounds of tobacco; which I find, by comparing the testimony of James White, with that of Thomas Sanner and James Biscoe, witnesses sworn and examined in this cause before the hearing thereof; which several annual sums being taken together, for the whole time aforesaid, do amount unto the sum of 16,250 pounds of tobacco; which I have allowed the complainant for the rents and profits of that part of his real estate which lies in Saint Mary’s county.
‘And I find, that the value of the profits of the complainant’s real estate, which lies in Anne Arundel county, mentioned in the sixth article of the first schedule to this, my report, annexed, did amount to the yearly sum of 2000 pounds of tobacco; which I find proved by the testimony of Jonathan Taylor of Anne Arundel county, a witness sworn and examined in this cause, before the hearing thereof; which, for the whole five years aforesaid, does amount to the sum of 10,000 pounds of tobacco; which I have allowed the complainant for the rents and profits of that part of his real estate which lies in Anne Arundel county.
‘And I also find, that by the acknowledgment of the defendant, the rents and profits of a store-house and lot, in Huntingtown, belonging to the complainant, mentioned in the seventh article of the first schedule to this, my report, annexed, did, for the *66 whole five years aforesaid, amount unto the sum of 1200 pounds of tobacco; which I have also allowed to the complainant for the rents and profits of that part of his real estate which lies in Calvert county. Which several sums of tobacco being taken together for the whole rents and profits of the complainant’s real estate, during the time aforesaid, do amount unto the sum of 27,450 pounds of tobacco, which I have reduced to sterling money, at the rate of 12s. 6d. per cwt.; which, having considered the testimony of Thomas Sanner and James White, witnesses sworn and examined in this cause before the hearing thereof, the first of which deposeth, that to the best of his memory, tobacco bore a good price from the year 1713 to the year 1718; and the second, that for the last two years, wherein he received the rents, that to the best of his memory, it was worth about fifteen shillings sterling, in bills of exchange, I have estimated to have been the market price of tobacco, taking it as a mean for the five years aforesaid; at which rate it does amount unto the sum of £ 171 11s. 3d. sterling; which sum of money I have allowed the complainant for the whole rents and profits of his real estate during the five years aforesaid.
‘And I likewise find, that the value of the profits which might have been made of the mulatto man called Ned, mentioned in the proceedings, for five years and one quarter, which time the defendant had the said Ned in his possession, did amount unto the sum of £ 105 gold currency, as charged in the eighth article of the first schedule, to this, my report, annexed, which I have estimated at the rate of twenty pound, gold currency, per annum; and allowed to the complainant, upon the testimony of Francis Gaines, John Gaines, and Samuel Griffin, witnesses sworn and examined in this cause before the hearing thereof: and the confession of the defendant in his answer, which admits the said mulatto Ned' to have been an ordinary carpenter and cooper.
‘I have likewise considered the allowances prayed to he made by the defendant in the second schedule, to this, my report, annexed; and have not made any allowance for the first article therein contained, of two negro men, which the complainant had of the defendant, for about five years before he came of age ; they being acknowledged by the defendant, to be part of the complainant’s estate ; and the complainant not appearing to have been any charge to the defendant during that time. But I have allowed the defendant for maintaining a negro girl, mentioned in the second article of the second schedule, to this, my report, annexed, at the rate of 300 pounds of tobacco per annum; which, for the first five years therein mentioned, does amount unto the sum of 1500 pounds of tobacco ; the said girl not being able then to work for her maintenance. I have also allowed, with the agreement of the complainant, to the 'defendant 1525 pounds of tobacco, and 77 bushels of wheat; which I have reduced to tobacco at forty pounds of tobacco per bushel, and does amount unto the sum of 3080 pounds of tobacco, for the quit rents of the complainant’s lands, paid to the receiver of the rents for the right honourable the Lord Baltimore, as mentioned in the third article of the second schedule, to this, my report, annexed; all which tobacco being.taken together does amount unto the sum of 6105 pounds; which being reducd to sterling, at the rate of 12s. 6d. per cwt. does amount unto the sum of £38. 3s. ljd. sterling.
‘I have also allowed, by the admission of the complainant, upon the oath of the defendant, for one pair of calash wheels, £2 12s. 6d. sterling; for two looking glasses, £2 sterling; for two pair of iron dogs, £2 sterling; for a large folding-table, £1 sterling, as mentioned in the fourth, fifth, sixth, and seventh articles of *67 the second schedule, to this, my report, annexed. For the eighth article in the second schedule, to this, my report, annexed, of a horse, bridle and saddle, and case of pistols, and sword, X have made no allowance; it appearing that the complainant had the things therein mentioned, of his mother, before her intermarriage with the complainant. But I have allowed, by consent of the complainant, for thirty-six pounds of pewter, £1 sterling; and for one beef, £115s. sterling, as mentioned in the ninth and tenth articles of the second schedule, to this, my report, annexed. All which several sums of sterling money together do amount to the sum of £48 10s. 7{d.; which I have allowed to the defendant to be deducted out of the sterling money above allowed to the complainant. And I have likewise allowed the defendant, with the consent of the complainant, upon the defendant’s oath, for $ 11, delivered by the defendant to the complainant, £2 9s. 6 d. gold currency; and for two casks of cider, containing about 200 gallons, £5 gold currency, as mentioned in the eleventh and twelfth articles of the second schedule, to this, my report, annexed; which two sums of current money do amount unto the sum of £7 10s. 6d.; which I have allowed to the defendant, to be deducted out of the currency above allowed to the complainant; which sum of £48 10s. 7\d. so as above allowed to the defendant; being deducted from the sum of £171 11s. 3d. so as above tobe allowed to the complainant, leaves the sum of £123 0s. 7£d. sterling money, which, after the deduction aforesaid, I find to be the clear balance, in sterling money, due to the complainant; and the sum of £7 9s. 6d. gold currency, so as before allowed the complainants ; being deducted from the sum of £ 105 gold currency, as above allowed the complainant, leaves the sum of £97 10s. 6d.; which, after the deduction aforesaid, I find to be the clear balance, in current money, due to the complainant.
‘And I have considered the complainant’s demand of interest in the ninth article of the first schedule to this, my report, annexed: and, inasmuch as I have no directions, by decree of this honourable court, to make any such allowance, I have not presumed to determine any thing therein — and I have annexed a third schedule to this, my report, wherein I have stated the account according to the allowances, above mentioned, between the complainant and defendant; and struck the balance thereof, for the more ready inspection of the court. — All which I humbly certify and submit to the judgment of this honourable court. — B. Young, Master in Chancery.’
Upon motion, on the 28th of February, 1738, by the complainant’s counsel it was prayed, that the said report might stand confirmed, and that the complainant might be allowed interest for the sum of money appearing by the said report to be due from the defendant to the complainant, from the 4th day of December, 1718, the time on which the complainant came to the age of twenty-one years, with his costs of this suit.
To which report the defendant, by his counsel, filed the following exceptions: This defendant excepts to the master’s report, first, for that he hath allowed the complainant the quantity of tobacco, in the report mentioned, for lands lying in Anne Arundel county, which were quarters, seated at the death of the complainant’s ancestor, whereon there was a stock of negroes, cattle, &cc.; and were never tenanted, or rented out by the said complainant’s ancestor, or the defendant — second, for that the master has allowed, at the rate of £20 gold, per annum, for the work of mulatto Ned, which is a sum much beyond what he ever did, or could earn — and

 Clapham v. Thompson, 1 Bland, 124, note; Dorsey v. Hammond, 1 Bland, 465. *68 for that the defendant was always ready to deliver the said Ned to the complainant, if he would have indemnified him therein — third, for that the master hath not allowed to him the quantity of tobacco, by him charged, for the service of two negro men, which the complainant had the possession and use of for above five years; and who were, all that time, at the risk of the defendant — and fourth, because the master has allowed the complainant the quantity of tobacco, mentioned in the report, for the lands lying in Saint Mary’s county, without having, as this defendant is advised, proper evidence to justify such allowance.
28th February, 1738. — Ogie, Chancellor. — Upon debating the said exceptions, and hearing what was alleged by counsel on both sides, it is
Decreed, that the said exceptions are insufficient; and therefore over-ruled; and that the said report, and all the matters and things therein contained, do stand ratified and confirmed, by the order, authority and decree of this court, to be observed and performed by all parties, according to the tenor and true meaning thereof. And it is hereby further Decreed, that the defendant pay to the complainant the legal interest, in sterling and gold currency, of £97 10s. 6d. gold currency, and £ 123 Os. 7id. sterling, reported to be due to the complainant from the defendant, as aforesaid, to be computed from the said 4th day of December, 1718, the time of the complainant’s being at the age of twenty-one years : and also, that the defendant pay to the complainant the costs of suit in this cause by him, in this court, laid out and expended. Chancery Proceedings, lib. J. R. No. 4, fol. 1 to 57.

 Woodward v. Chapman. — This bill was filed, on the 4th of December, 1742, by Henry Woodward, an infant, by Edward Dorsey, his, guardian, and Mary, Elizabeth, and Eleanor Woodward, infants, by Richard Dorsey, their next friend, against Levin Gale and William Chapman. The bill stated, that the plaintiff’s father, Amos Woodward, died on the 16th of March, 1734, intestate, leaving a very large personal estate, consisting of negroes, ready money, plate, rings, a sea vessel, which had after his death, been sent to Barbadoes, brought a return cargo of rum, &c. Besides which, the intestate had left choses in action, and other goods and chattels of very considerable value, sufficient to pay all his debts, with a great surplus. That administration of the intestate’s estate, had been granted to his widow, Achsa Woodward, the mother of the plaintiffs: that the negroes, belonging to the estate of the intestate, Amos, the year he died, made a large crop of corn, tobacco, and other things; which the administratrix, Achsa, never accounted for; but converted to her own use; that she, accordingly, had taken possession of the intestate’s estate, *69 and returned an inventory and list of debts, to the commissary’s office, in which she failed to include many articles of property of great value, and several good debts due to the intestate, and had sold seven of the negroes belonging to the estate of the intestate. That she had afterwards intermarried with Edward Eottrell, who, although he had notice of the omissions in the inventory and return of the said Achsa, had failed to make any return thereof, as he ought to have done. That the said Achsa died in February, 1742, intestate; and afterwards, in the same month, the said Edward died, having previously by his will appointed Bazil Dorsey and Alexander Lawson his executors, who, having refused to act as such, administration, with the will of the said Edward annexed, had been granted to these defendants; and that letters of administration de bonis non, of the intestate Amos; and of administration of the intestate Achsa, had been also granted to these defendants. That the plaintiffs had been put to school a very little time, and had no other means to defray the expense of their schooling and maintenance. And that the defendants had sold the greater part of the negroes belonging to the estate of the intestate Amos. Whereupon it was prayed, that the defendants should be compelled to make up a full account of the estates of the intestates Amos and Achsa, and deliver to the plaintiffs their distributive part thereof; and in the mean time to give and allow to the plaintiffs a maintenance and education according to the interest and profits of their estate; and that they might be relieved in all and singular the premises.
The defendant Chapman by his answer admitted the death of Amos Woodward; that the plaintiffs were his children ; that administration had been granted, as stated in the bill, to Achsa, her marriage, and the death of her and her husband Fottrell; and the administration granted on their estates to these defendants : but denied, that any administration de botiis non had ever been granted, as charged, on the estate of the intestate Amos. This defendant denied that there was any crop begun and growing on the plantation of the intestate Amos, at the time of his death: and further, that this defendant knew nothing of the nature and amount of the estate which had come to the hands of the administratrix Achsa, or her husband Edward ; or how that which had, as was alleged, come. to their hands, had been administered. Other matters were set forth by this defendant, who, in conclusion, stated, that he was willing to account and pay under the direction of this court.
The defendant Gale answered to the same effect; and admitted, that a sea vessel, belonging to the intestate Amos, had, since his death, been sent to Barbadoes, and had brought back a cargo of rum, &c. which had come to the hands of the administratrix Achsa. This defendant also admits, that there was on the plantation of the intestate Amos a small quantity of wheat in hand, or begun at the time of his death. And that the administratrix did sell and dispose of, upon credit, several negroes, belonging to the estate of her intestate, viz: Sarah and her sucking child, Jacob, Boson, Betty, Boson, ailing, and Beck, for £ 162 sterling; which were appraised to £140 current paper money. [Bills of Credit under the act of 1733, ch. 6.] But this defendant knows nothing of the manner in which the administratrix Achsa administered or accounted for the estate of her intestate which came to her hands. This defendant concludes by declaring his readiness to account as the court may direct, &c.
February, 1743. — Bladen, Chancellor. — Ordered, with the consent of the defendant Gale, that an allowance of £40 currency be paid to the guardian of Mr. Woodward’s children, for the maintenance of the said children until the next court; and that such sum be deducted out of such part of the estate as shall appear to be due to them.
*70 The plaintiffs put in a general replication to the answers of the defendants; upon which a commission was issued, in the usual form, ‘to examine evidences, and also to audit, state, settle and adjust all accounts,’ between the parties. (Clapham v. Thompson, 1 Bland, 124, note. Dorsey v. Dulany, 1 Bland, 465, note.) Under which commission much testimony was taken: from which an account was stated; as to all which the commissioners made report as follows :
‘To his excellency, Thomas Bladen, Esq.- Chancellor of Maryland — We humbly certify, that by virtue of the commission hereunto annexed, and to us directed, (having chosen Bichard Burdus to be our clerk,) we met on several days and times, and proceeded to take the depositions of Messrs. John Lomas and Edward Dorsey to several interrogatories, to them severally administered, as by the same interrogatories and depositions hereunto annexed will appear. — And we further certify, that we have stated, audited, settled, and adjusted all such accounts as were, by either parfy, produced; and have computed the interest on bonds, from the time of their administration granted, till payment of principal; part of which interest we find paid, and the other part not paid, as by the first and second columns of the account A, hereunto annexed, appears ; and humbly submit it to your excellency, whether Mr. Woodward’s estate ought to have the benefit of the interest received after administration granted, or the administratrix; and whether the administratrix ought to be chargeable with interest, mentioned in the second column, when it does not appear to us, that any was received.
‘And we find, that Edward Fottrell, and Achsa his wife, are chargeable for the personal estate and debts due to the said Amos Woodward, exclusive of the rum cargo, to the amount of £96 17s. 2d. £27 15s. 5d. — 2732 pounds tobacco — £1367 7s. 114d. gold — £815 19s. Id. sterling — £2502 lis. 0¿d. paper money; including the interest referred to your excellency’s consideration, as by the said account marked A, hereunto annexed, may also appear; and also are chargeable with several articles, to the amount of the sum of £1198 10s. 3d. which are to be returned in kind, as by the said account marked A, appears ; and also are chargeable for sundry debts due on the butcher’s book, which is also included in the said account marked A, as by the account marked B, will appear. — And that they, the said Edward Fottrell and Achsa his wife, have paid sundry debts due from the said Woodward to sundry persons, which, we apprehend, ought to be deducted out of the total amount of the account marked A, amounting to 2246 pounds tobacco — £1133 2s. Od. gold — £298 18s. 2d. sterling, as by the account marked C, hereunto annexed, may appear.
‘And we further certify, that there are sundry debts, that appear to be' due from sundry persons to the said Amos Woodward, as well on his ledger, as on his butcher’s book, amounting in the whole to the sum of 600 pounds tobacco — 4565 pounds tobacco — £780 7s. 3hd. gold — £383 11s. 8¿d. sterling, and £78 6s. 5id. paper money, as by the accounts marked D and E, hereunto annexed, may also appear; but does not appear to us to have been received either by the said Fottrell or his wife. All which is humbly submitted to your excellency, by Thomas Worthington, John Brice, Nicholas Maccubbin, John Bullen.’
At December court, 1746, the defendant Gale being dead, and the case as to him being abated, the defendant Chapman filed the following exceptions to the said report. First. That since the order for publication of the examinations .and proceedings of the said commissioners it appears, that a certain John Lomas, and the aforesaid Edward Dorsey, were respectively examined, and have deposed to interrogatories filed on behalf of the complainants in the above cause; and for that this exceptant had not any notice of the time and place of such intended examination, *71 previous thereto, as according to the use and practice of this court, in like cases, he ought to have had; he humbly hopes the said depositions, or any of them, shall not be read, or made use of; but shall be wholly and entirely suppressed. Second. That it appears by the complainants’ bill, and admitted by this defendant’s answer, that Amos Woodward, the complainants’ father, died about the 16th day of March, 1734; and although it is denied by this exceptant’s answer, that there was any crop, either of tobacco, corn, or any other grain, or crop whatsoever, belonging to the said Amos Woodward, begun, or in hand at the time of his death ; and the same is not contradicted by any proof, appearing among the proceedings of the said commissioners, they have, notwithstanding, in the account by them stated and returned, made an allowance of £50 paper to the said Amos Woodward’s estate, for the labour of sundry servants and slaves on his plantation, from the time of his death until July following, which this exceptant humbly conceives to be against law and equity. Third. That it appears by the proceedings, that there are two several estates dependent on the estate of the said Amos Woodward, that is to say, the estate of the said Achsa Fottrell, to which this exceptant is administrator, and also the estate of the said Edward Fottrell, to whom this exceptant is also administrator, with his will annexed; and that the estate of the said Edward Fottrell is also dependent on the estate of her, the said Achsa Fottrell; notwithstanding which the said commissioners have, in their manner of stating the accounts, blended the several transactions together; and have not distinguished what moneys were received by the aforesaid Achsa, during her widowhood; and what by the said Edward Fottrell, after his marriage, in the proceedings in this cause set forth; nor, if this honourable court should be of opinion, that the estate of the said Amos Woodward should be credited with the interest in the accounts mentioned, have they distinguished and shewn, whether the interest, so said to be received or omitted to be received, was so received or omitted to be received by the said Achsa Fottrell, or by the said Edward Fottrell, thereby to enable this court to determine to which of their two estates the same is chargeable and to be charged.
May, 1747. — Ogle, Chancellor. — The exceptions to the commissioners’ report standing for argument, and the counsel on both sides being heard, it is Ordered, that the exceptions be overruled; and that the defendant pay to the complainants the quantify of 600 pounds of tobacco for the delay; and that there be a hearing of the said cause the next court.
After which the case was brought before the court, and the solicitors of the parties were fully heard.
October, 1747. — Ogle, Chancellor. — Decreed, that the said William Chapman pay, out of the estate of Achsa Fottrell, and Edward Fottrell, which have come to Ids hands, to each of the complainants the sum of 43J pounds of tobacco, £51 15 s. 3 id. current money, in gold or silver, £216 7s. 0£d. sterling money of Great Britain, of which said sum £80 10s. 6<L is each child’s part of the price of the negroes belonging to the estate of Amos Woodward, as the same were sold by Achsa Woodward and Levin Gale, and William Chapman, exclusive of any negroes that were Edward Fottrell’s, or which came to his possession, in any other manner than by his marriage with Achsa Woodward, administratrix of Amos Woodward; and £377 19s. 10<2. paper money of Maryland, [1733, ch. 6.] And that the said William Chapman shall, out of the said estate of Achsa Fottrell and Edward Fottrell, which have come to his hands, likewise make payment of the several sums following, to wit, to each of the complainants the sum of £9 Is. 8d. paper money of Mary *72 land, in white servants ; and the sum of £32 Is, 7a!. paper .money of Maryland, in cattle, horses, and sheep ; and the sum of £ 13 6s. 6<Z. paper money of Maryland, in plate, belonging to the complainants’ late father, Amos Woodward; and the sum of £2 15s. lid. in gold tea-spoons, belonging to the complainants’ late father, as the same were valued in his estate. And it is Ordered, that the white servants, cattle, horses, and sheep, be valued by Thomas Worthington and John Bullen, of Anne Arundel county, gentlemen; and that they value the same, as near as can be, of like value with the white servants, horses, cattle and sheep that were appraised in the estate of the complainants’ father, Amos Woodward.
And it is further Decreed, that the said William Chapman pay unto the complainants, out of the estate of Achsa Eottrell and Edward Fottrell, which have come to his hands, interest at the rate of six pounds per cent, per annum on the sum of 43£ pounds of tobacco, [1704, ch. 69, s. 1;] £51 15s. 3d£. current money, in gold or silver; £216 7s. OJd. sterling; and £377 19s. 10d. paper money of Maryland; which is due to each child, exclusive of white servants, cattle, horses, sheep, plate, and gold tea-spoons. It being thought reasonable, by this court, that no interest should be paid for so much of the estate as consisted in white servants, cattle, horses, sheep, plate, and gold tea-spoons, which are to be returned in specie to each of the complainants, [1715, ch. 39, s. 11, 12, 16, and 17,] from the 15th day of February, in the year of our Lord 1741, till the same be paid to the complainants. And, that so much as is decreed to be paid to the complainants Mary and Elizabeth, who are arrived at. the age of sixteen years, to be paid into their own hands, [1715, ch. 39, s. 15;] and that so much as is decreed to be paid to the complainant Henry, be paid to Edward Dorsey, his guardian; and that so much as is decreed to be paid to the complainant Eleanor, be paid to John Kidgely, her guardian; and that the said Edward Dorsey and John Kidgely respectively give security, at the next court to be held for Anne Arundel county, to be approved of by the justices of the said court, to pay such sums as they have, or shall receive of the said Chapman, to the said Henry Woodward when he shall arrive at the age of twenty-one years; and to the said Eleanor Woodward when she shall arrive at the age of sixteen years; and that the complainants, or their guardians, give unto the said William Chapman good security to return a rateable part of what they shall receive to satisfy any debt or debts which shall hereafter appear to be due from the said Amos Woodward, with the payment whereof the law will charge the said William Chapman as administrator; and that the complainants pay two-thirds of the costs of this suit; and the said William Chapman one-third part thereof. And it is further Ordered, that the said William Chapman use his utmost endeavours to receive what debts are due to the estate of the said Amos Woodward at this time; and that he render an account of what he shall receive, upon oath, to this court, by the last day of November next.— Chancei-y Proceedings, lib. J. R. No. 5, fol. 157 to 212.

 Sloss v. McIlvane. — This was a bill for an account, filed on the 16th of May, 1760, by Thomas Sloss against William and David Mcllvane; in which the dealings and transactions between the parties were set out at great length. The bill concludes by alleging, that the defendants are residents of Philadelphia, but are expected soon to be in the province — upon which it prays a ne exeat, to the sheriff of Kent, and also a duplicate of the writ to the sheriff of Cecil.
To this bill, an affidavit was subjoined in the following words: ‘The said Thomas Sloss, the complainant in the annexed bill of complaint, makes oath, that the said William and David Mcllvane, the defendants in the said bill named, are justly *73 indebted to him in the sum of £300 current money, or upwards, or the value thereof, which he cannot now exactly ascertain; and that the said defendants are merchants of Philadelphia, and intend, or one of them intends, as this deponent believes, soon to be in this province about business; but that, in a very little time, they will again leave and depart this province, and again return to Philadelphia; and likwise that he doth believe the recovery of the said debt will be very precarious, unless they are stayed by a ne exeat provindam. — Sworn to this 16th day of May, 1760, before John Bullen.’
‘Whereupon, accordingly issued ne exeats and subpoenas against the aforesaid William and David Mcllvane to appear and answer the bill aforesaid — and the said cause standing so continued until April court, 1762. It was then •Ordered, that a commission issue, directed to Messrs. William Sword, William Humphreys, William Murray, and Andrew Eliot, merchants in Philadelphia, to taire the answer of the said defendants William and David Mcllvane, to the aforesaid bill of complaint of Thomas Sloss, complainant, which issued accordingly.’
The defendants having answered, and the parties being at issue; a commission was issued to examine evidences in the then usual form, requiring the commissioners to cause notice to be given to the parties, or their attorneys, of the execution of the commission : and after they had taken the depositions, to ‘send the same, together with this our commission dose, under your, or any three, or two of your hands and seals to us in our High Court of Chancery,’ &e. After which, the case was brought before the court.
February, 1770. — Eden, Chancellor. — It is Decreed, that the defendant do pay to the plaintiff what, on account to be taken, shall appear to be due; and, in order that the same may be settled and liquidated, that commission do issue to Messrs. John Davidson, Thomas Harwood, Thomas B. Hodgkin and Thomas Hyde. And, as touching and concerning the claim or charge of commission, or allowance, in the complainant’s bill mentioned; it is by the court, Ordered and directed, that the same, or any part thereof, be not admitted; and as touching or concerning any other matter or thing, in taking the said account, liberty is granted, should occasion require, to apply, from time to time, for the farther order and direction of the court, as well on the part of the complainant as of the defendant.
This case having abated, by the death of the defendant, who was the surviving partner, a bill of revivor was filed against Levin Wilson, his administrator, who filed his answer thereto, sworn to before a justice of the peace.
‘Whereupon, it is Ordered, by his excellency, the Chancellor, that the proceedings in the cause shall stand and be revived; and that the commissioners, heretofore appointed by this court to state and liquidate the accounts between the parties, proceed in stating and liquidating the same.’
The commissioners stated and reported an account accordingly, and the case was brought before the court for a final decree.
18Ih May, 1773. — Eden, Chancellor. — Decreed, that the defendant Levin Wilson, as administrator aforesaid, pay and satisfy to the complainant Thomas Sloss, the sum of £497 5s. 7common money, the balance due to the complainant, on the first day of January, 1759, appearing by the account taken and returned in this cause, together with legal interest on £389 5s. Oilti. part thereof, which part is in no sort constituted of interest, from the said first day of January, 1759, until the time of settling the said account, to wit, the 16th day of February,-1773; and also with *74 interest on the said sum of £497 5s. 7%d. from the said I6th day of February, 1773, until such time as the same shall be paid and satisfied.
And further, that the defendant Levin Wilson, administrator aforesaid, pay and satisfy to the complainant Thomas Sloss, the further sum of £323 10s. 3ster-ling; and 683J pounds of tobacco, being the sum of money and tobacco paid by the complainant, according to the order of this court, made on the 20th day of February, 1767, to the aforesaid William Mcllvane, with interest on the said sum of sterling money and tobacco, from the 1st day of July, 1767, the time when the same was paid by the complainant, until the same shall be again paid to him.
And further, that the defendant, as administrator aforesaid, pay to the complainant all costs expended by him in this suit, as well as all costs expended by him in the action formeily depending in the Provincial Court, mentioned in the said former-order; and the plaintiffs’ and defendants’ costs of the action brought, in Somerset County Court, by Thomas Dasheall, against this complainant for fees on the execution issued on the judgment obtained at law, by the said William Mcllvane against the complainant.
And because it does not appear to this court, that the defendant Levin Wilson, as administrator aforesaid, hath any assets in his hands wherewith to satisfy this decree, it is Ordered, that the same be paid and satisfied out of any assets which may hereafter come to the hands of the defendant, to be administered. — Chancery Proceedings, lib. W. K. No. 1, fol. 166 to 209.

 ‘February, 1735. — Sedente curia. — Ruled, that exceptions to reports made by the master, be filed twenty days before the succeeding court, after the report is made; or report to stand confirmed.’ — Chancery Proceedings, lib. J. R. No.2, fol. 735.

 1785, ch. 72, s. 17;- Rawlings v. Stewart, 1 Bland, 22, note; Clapham v. Thompson, 1 Bland, 124, note; Bryson v. Petty, 1 Bland, 182, note; Dorsey v. Dulany, 1 Bland, 465, note; Cox v. Callahan, ante 46, note.

 Maidwell v. Griffith, 1787. — Rogers, Chancellor. — Ordered, that -John Weatherburne be appointed auditor, to make, state, and take an account between the parties to this suit. — Chancery Proceedings, lib. S. H. if. lelt. B.fol. 32.
Kerr v. Rawlings. — December, 1789. — Hanson, Chancellor. — An account having been heretofore decreed, and the complainant’s counsel having applied to the court for instructions to the auditor in stating it; and several points relative thereto, having been debated; the Chancellor is of opinion that, &c. &c. that the account to be stated agreeably to the instructions, be open to the exceptions of either party.
The auditor reported an account accordingly, to which exceptions were filed which were decided upon in the final decree. — Chancery Proceedings, lib. E,fol. 311.
Towers v. Hannan. — 5th May, 1807. — Kilty, Chancellor. — Decreed, as to the part of the said bill praying for a conveyance, that the defendant J. Hannan, do by a good and sufficient deed, executed, acknowledged and delivered according to law, convey to the complainant E. Towers, the premises, in the proceedings mentioned, to wit, a lot and dwelling house in the city of Baltimore, situate in Albemarle street, being part of a lot, number 326, containing 20 feet in front, and 40 feet in depth, with all and singular the appurtenances and privileges thereto belonging. To have and to hold the same from the date of this decree; and during the term of the natural life of the said E. Towers. And it is further Decreed, that the said E. Towers have possession of the said house and lot, with the appurtenances and privileges aforesaid.
And it is further Decreed, as to the part of the bill praying for an account, that the defendant J. Hannan, account with the complainaut for the rents and profits of the *76 said lot, during the time of his possession thereof, under the judgment in the ejectment aforesaid; and that an account be taken by the auditor of this court, of the said rents and profits on the evidence in the cause, and such other evidence as the parties may produce to him; subject to the exceptions of either parly; and to the further order of this court, and to its final decree thereon. The parties respectively to pay their own costs — M. S. affirmed on appeal.

 Dorsey v. Hammond, 1 Bland, 465.

 Clapham v. Thompson, 1 Bland, 124. note; Rutland v. Yates, 1 Bland, 465, note.

 1785, ch. 72, s. 17. — Cheseldine v. Gordon. — This bill was filed on the 14th day of December, 1740, by Kenelmn Cheseldine against George Gordon and Kenelmn C. Jowles, executors of George Forbes, deceased, and Ann Greenfield, executrix of Thomas T. Greenfield, deceased, and Dryden Forbes, executrix of Henry P. Jowles, deceased. The hill states that Kenelmn Cheseldine made his will, by which he made sundry devises, and appointed his wife, the plaintiff’s mother, his executrix; and also appointed Thomas T. Greenfield, now deceased, and the testator of the defendant Ann, and Henry P. Jowles, now deceased, and the testator of the defendant Dryden, as guardians of the plaintiff, his son and heir— soon after which, he died seized and possessed of several tracts of land. That the plaintiff was then about four years of age, and his mother and George Forbes entered apon, or continued in possession of the lands which had so descended, or been devised to the plaintiff; but that soon after, Thomas T. Greenfield, the testator of the defendant Ann, and Henry P. Jowles, the testator of the defendant Dryden, forcibly took possession of all the lands which had so descended, or been devised to the plaintiff, and held possession thereof until after he attained his full age, and recovered the same, from those who claimed under them, by actions of ejectment. ( Cheseldine’s lesse v. Brevier, 1 H. and McH. 152.) That they sold timber from the land, and took all the rents and profits thereof without rendering any account whatever, or paying any thing for the same; or allowing any thing for the support and education of the plaintiff. Whereupon, it was prayed that the defendants might render an account of the rents and profits, and the interest thereof, which were or might have been of the plaintiff’s lands; and that the plaintiff might be otherwise relieved in the premises according to equity.
The defendants answered separately, but all nearly to the same effect. They admitted that the said Kenelmn Cheseldine had made his will, appointing guardians to his pretended children; and soon after died seized of several tracts of land; but denied that he had, or could devise the lands in question to the plaintiff; because they were held by him, as devisee in tail, from his father, with remainder over, on failure of issue, to his three sisters; and, he dying without lawful issue, the lands passed accordingly to the testators of these defendants. They further admit, that when his alleged father died, he was about four years of age." These defendants in answer, say, that a certain Mary Sheppard, the complainant’s mother, who lived at the house of his alleged father, at the time of his death, in a short tipie thereafter, removed from it, and quietly delivered possession of the house and plantation to Messrs. George Forbes, Henry P. Jowles, and Thomas T. Greenfield, on behalf of themselves, and their wives, the devisees in remainder, without any demand of dower, or other right therein; and that they entered upon, and took possession of the lands, and received the rents and profits accordingly. These defendants further admit, that the plaintiff brought an action of ejectment, and recovered as stated; but allege, that no actual marriage was proved on the trial in that action, to have been had between the said Mary Sheppard and the said Kenelmn Cheseldine, the puta *80 tive father of the plaintiff: that it was given in evidence in that action, on the part of the defendant, that the minister of the parish, where the said Kenelmn lived, several times admonished him and Mary for unlawfully cohabiting together; and thereupon he informed the minister, that he had been married to Mary by Parson Scott; who, on inquiry, declared he had not married them; and upon the said Cheseldine being told of it, and again admonished, he told the minister that they had been married by one Priest Gulick; who, upon inquiry, also declared, that he had not married them. Whereupon, the minister informed the governor, who ordered the then attorney-general to prosecute him: and he was accordingly presented for unlawfully cohabiting with the said Mary. Upon which a venire facias was issued against him to answer the presentment; but, that the attorney-general entered a nolle prosequi ; and that during such unlawful cohabitation he had declared, he had intended to marry her, but thanked God he had not done so, swore he never would, and turned her out of his house, with the plaintiff in her arms; and declared, about fiye months before his death, she was not his wife; that after his death she went over to Virginia to procure a false certificate from Parson Breeton of his having married them; who declared he had not married them, and refused to give any such certificate. Vet, notwithstanding the proof of these and many other strong circumstances on that trial, the jury, by the great interest of the complainant, his attorney and others, brought in a verdict in favour of the complainant, contrary to the proof of the illegitimacy of the plaintiff; and judgment was entered up thereon. These defendants further admit, that their testators, and their wives had possession of the mansion-house and a part of the land, after the death of the plaintiff’s father; that Dryden Forbes held another part of the land; and that Thomas T. Greenfield and his representatives, after his death, held another part of the land; but they do not know what, or whether any rents and profits were received by them, or any of them; nor do they know of any timber being sold from the land.
The plaintiff filed exceptions to the answer of each defendant for nearly the same causes. The exceptions to the answer of the defendant Gordon, were as follows : the complainant excepts to the answer of the defendant Gordon ; first, for that the defendant, instead of answering the allegations contained in the complainant’s bill, launches out into scandalous and personal reflections on this complainant, which are not examinable, or determinable in this honourable court; especially as this complainant’s right hath been tried and determined according to the laws of the land; secondly, for that the answer of the defendant needlessly and uselessly asperses the memory and character of a gentleman who was attorney-general; and has been many years dead; which aspersions cannot possibly be examined into; nor can they possibly affect the merits of the cause, or answer any other justifiable purpose whatsoever; thirdly, for that the defendant only answers generally, that the several persons mentioned in the said answer, or some, or either of them, réceived the rents and profits of the said lands; but does not answer or set forth who received such issues or profits; how much they were, how much each tract was, or might have been rented, let, or leased for by the year, either positively or to the best of his knowledge, remembrance, or belief; all which ought to have been done; the same being required by the complainant’s bill; and fourthly, for that it is alleged in the complainant’s bill, that the several persons and defendants therein mentioned, made great profit and advantage by, and received great sums of money and tobacco *81 from the sale of timber from the said land and otherwise; to which the defendant hath not given any answer, although required so to do by the complainant’s bill. The complainant, therefore, prays that the said defendant may amend his answer as to the same, and give in a full and sufficient answer to the complainant’s bill of complaint.
At May term, 1745, the counsel for the defendants admitted the answers to be insufficient and imperfect in the several particulars excepted to; and therefore consented that the exceptions aforesaid be adjudged good and sufficient; and the answers insufficient in the particulars in the exceptions mentioned; and that the matters excepted to for scandal and impertinence be expunged; and the answers stand as to the other particulars; and the defendants pay the usual costs; and the scandal and impertinences contained in the said answers were accordingly expunged.
Upon motion of the counsel of the complainant, alleging that the scope of the complainant’s bill was to have an account, and to obtain satisfaction for the rents and profits of his lands while they were unjustly withheld from him, together with the interest thereof; it appearing by the bill and answers, that the complainant’s right to the said lands had been adjudged to him by due course of law; and therefore, that the only matter under consideration of this court, was the quantum of the rents and profits, and the interest thereof; and the loss sustained by the complainant by his lands being withheld from him; the case was submitted for a decree to account, &c.
27th May, 1746. — Bladen, Chancellor. — The counsel on both sides being present, and the counsel for the defendants not objecting, but confessing to what was moved for on behalf of the complainant, this court doth Decree, that the Hon. George Plater, Esq. Messrs. Abraham Barnes, John Hicks, and James Mills, or any three or two of them, take an account of the issues and profits of the land mentioned in the bill of complaint, during the infancy of the complainant; and the time he was kept out of possession of the said lands; and, if need be, to examine evidences concerning the same; and return their proceedings thereon into the court, with all convenient speed.
Under which order, on the 23d of February, 1747, the following return was made, to will ‘we the subscribers, three of the persons named in the order hereunto aunexed, do in obedience thereto, humbly certify, that after due notice had been given to each and every of the defendants in the same cause, that we intended to meet at the house of the petitioner, situate on the premises mentioned in the bill of complaint, on Tuesday, the 26th day of January, instant, in order to execute the power given by the said order; and being so met; there were also Messrs. George Hamilton, who intermarried with the daughter of George Gordon, Kenelmn T. Greenfield, ¡oldest son and heir at law of Col. Thomas T. Greenfield, and James Forbes only son and heir apparent of Mrs. Dryden Forbes, in whose presence and hearing were sworn, as evidences, Col. Jos. Jordan, Thomas Shanks, John Bond, John Hult, John Long, Jos. Shanks, John Boult, Edmund Bouling, and Thomas Brewer, from whose several examinations it appears plainly to us, that the petitioner was out of possession of the land and premises, in his bill of complaintmentioned, from the spring of the year, 1718, to the latter end of October, 1739; during all which time the greatest and best part of the tract of land called Mattapony. was held and occupied by George Forbes, deceased, and the rents, issues and profits of the same; *82 and the damage the said Kenelmn Cheseldine sustained thereby, is of the value of 61,500 lbs. of tobacco: and that the rest of the said tract of land, was held by Col. Henry P. Jowles, deceased, from the said spring of 1718 to the time of his death; and by his widow after his death, until her intermarriage with a certain John Jowles, gentleman, deceased; and after his death, by her again until the said October, 1739; and that the rents, issues, and profits of the same; and the damage the same Cheseldine sustained thereby, is of the value of 1150 lbs. of tobacco per annum, amounting in the whole, to 23,000 lbs. of tobacco. And the island and tract of land called White’s Neck, also mentioned in the same bill, were severally held and occupied for the same space of time by Thomas T. Greenfield, gentleman, deceased; and after his death by Ann Greenfield, his widow, or by his or her under-tenants ; and that the rents, issues and profits of the same, and the damage the said Kenelmn Cheseldine sustained thereby was, and is of the value of 31,000 lbs. of tobacco. All which is certified by us, the subscribers, this 28th day of January, 1747. George Plater, Abraham Barnes, James Mills.’
May, 1748. — Ogle, Chancellor. — Decreed, that the said George Gordon, executor of the said George Forbes, one of the defendants, pay to the complainant 61,500 lbs. of tobacco out of the goods and chattels, which were of the said George Forbes, in his hands to be administered; and that the complainant recover the same accordingly. And that Dryden Forbes, one other of the defendants, pay unto the complainant such part of the quantity of 23,000 lbs. of tobacco, as was received by the said Henry P. Jowles, her former husband, in his life time, out of the goods and chattels which were of the said Henry P. Jowles, remaining in her hands to be administered, if so much she hath; and such part thereof as was received by the said John Forbes, her second husband, out of the goods and chattels which were of the said John Forbes, in her hands to be administered, if so much she hath; and the residue of the said 23,000 lbs. of tobacco, which she received after the death of the said Henry P. Jowles, and before her intermarriage with the said John Forbes; and so much thereof as she received since the death of the said John Forbes, out of her own proper goods and chattels, and that the complainant recover the same accordingly. And that the other defendant Ann Greenfield, pay unto the complainant so much of the 31,000 lbs. of tobacco, mentioned in the said return, as was received by the said Thomas T. Greenfield, her testator, out of his goods and chattels remaining in her hands to be administered, if so much she hath; and the residue of the said 31,000 lbs. of tobacco, which she received since the death of her said testator, out of her own proper goods and chattels, and that the complainant recover the same accordingly. And it is further Decreed, that the complainant recover all his costs in this cause against the defendants out of the goods and chattels of their respective testators in their hands to be administered, if so much they have; if not, that the complainant recover one-third part of the said costs of the proper goods and chattels of the said Dryden Forbes, and one-third part thereof of the proper goods and chattels of the said Ann Greenfield.’ — Chancery Proceedings, lib, J. R. No. 5. fol. 339 to 371.
Barney v. Hollins. — 4th January, 1810. — Kilty, Chancellor. — Decreed, that the parties account with each other concerning the partnership transactions of the said parties, under the firm of Barney and Hollins in the proceedings mentioned. That the auditor of this court state the account relative thereto, on the evidence in the cause, and such other evidence as the parties may produce to him, on notice as *83 usual In such cases. The said account to be returned to this court for further order, and subject to the exceptions of either party. The Chancellor has to remark, that the taking of further evidence by the auditor, after the decree to account, appeared to be the practice ; and has so continued since his coming into office. M. S.

 The State v. Brooke, ante 42 note. — Cockey v. Chapman, 10th February, 1729, Injunction bill; answer filed; motion to dissolve the injunction this court; ruled motion to dissolve the injunction 21st February; on motion of the defendant’s counsel, and hearing what was alleged by the counsel of both sides, ruled that injunction be dissolved.
After which, the plaintiff by his petition stated, that his injunction had been dissolved, as he understood, upon the ground, that he had not paid certain fees to the sheriff, &c. "Whereupon he prayed, that another injunction to stay execution against him, upon his giving security to pay the execution fee in case the court, at the hearing, should decree the same to be due.
16tó March, 1729. — Calvert, Chancellor. — Having heard the arguments of both parties, in relation to the subject matter of this petition, it is Ordered, that the hearing of the cause between Chapman and Cockey be on the 11th of April next, being the Saturday before the assizes in Anne Arundel eounty. And that any depositions taken before Mr. Beale, or any other magistrate of the city of Annapolis, in relation to this cause, be allowed as evidence upon the hearing. It is further Ordered, that injunction issue in the mean time, upon giving security. And, in case any execution is issued and executed, the good3 to be stayed in the sheriff’s hands till hearing the cause.
Injunction issued accordingly. After which, the plaintiff filed his bill, setting forth his case in due form and at large. To which bill the defendant put in his answer; and the case was thus brought before the court on bill and answer alone, on the day appointed.
litó April, 1730. — Calvert, Chancellor. — Decreed, that the injunction prayed for in the bill, be perpetual. And it is further Ordered, that the sheriff of Anne Arundel county, restore to the complainant the negroes taken from him in execution. Chancery Proceedings, lib. X E. No. 2, fcl. 13, 16, 24.

 Onion v. McComas. — This bill was filed on the 17th of November, 1800, by John B. Onion, against William McComas and Thomas B. Smith, to obtain an injunction to stay proceedings at law, on a judgment rendered in favour of the defendant Me Comas, for the use of the defendant Smith, on abend as assignee thereof from the defendant McComas, against the plaintiff; and for general relief, &c. The injunction was granted as prayed; and the defendant McComas having put in his answer, and given notice of a motion to dissolve the injunction, the matter was accordingly brought before the court.
2d February, 1802. — Hanson, Chancellor. — The motion to dissolve the injunction in this cause issued, being submitted, the bill and the answer of McComas, and the exhibits referred to, as parts of the bill and answer, were by the Chancellor read and considered.
*84 The bill and the answer are both so drawn, that it is difficult to determine whether or not McComas has denied the equity stated in the bill. However, it appears from the bill material, for the complainant to get an answer from Smith. As that answer has not been given, and as Smith appears from the proceedings, to be the defendant alone interested, at this time, in the judgment obtained against the complainant; it is Ordered, that the injunction be continued until the final hearing or further order.
After which, the defendant Smith put in his answer; and gave notice of a motion to dissolve the injunction at the next term, when the matter was brought before the court.
2d July, 1802. — Hanson, Chancellor. — The Chancellor having considered the answer oí Thomas H. Smith; and the said Smith not denying the material facts stated in the bill; it is Ordered, that the injunction heretofore issued in this cause, continue until final hearing, or further order.
After which, the case was again brought before the court.
20th July, 1802. — Hanson, Chancellor. — The Chancellor has twice considered this case, and each time on a motion to dissolve; the two answers having been filed at different times.
It appears, on account of some peculiar circumstances stated in, or collected from the proceedings, that each party should be desirous of having the cause speedily decided on its merits. What proceeding is first to be had for that purpose, may possibly be doubtful to the counsel. The Chancellor conceives, that the best thing to be done for both parties', would be to have an order to state an account between Onion and McComas, as matters stood on the day of the assignment of the bond; and likewise as they stand at this time, without regarding the assignment of the bond to Smith; and for the auditor to examine witnesses, if any shall be produced; for the said account, when stated, to be liable to exceptions; and the question, or questions of equity are reserved.
The Chancellor thinks it much better to have such an order by consent, than to issue a commission, on application, and on his own authority, for taking depositions; and he is positive, that neither party, if desirous of a speedy decision on the real merits of the cause, will reject his proposal. If they shall agree to it, let them, or their solicitors, or either of them; and the solicitor of the other, sign the writing subjoined.
We consent, that an order pass conformably to the foregoing recommendation or proposal of the Chancellor. This writing was signed accordingly.
Sundry depositions having been taken and returned, the case was submitted for a final determination,
12th November, 1804. — Hanson, Chancellor. — The papers in this cause have often been laid before the Chancellor, and as often he has acted on them, as his judgment dictated. They are now laid before him, as for a final decision, depositions having been returned.
The Chancellor refers to his remarks and propositions of July 20th, 1802, which appear to have been agreed to by the counsel. Agreeably to that proposition and agreement, as soon as the depositions were returned, they ought to have been laid before the auditor. After lying several terms in the office, the papers are now laid *85 before the Chancellor instead of the auditor. But whether or not they ought to have been laid before the auditor, the Chancellor now thinks proper to order; and it is Ordered, that, from the aforesaid depositions, and other proceedings, the auditor of this court, state and report an account, or accounts, agreeably to the said propositions and agreement of July 20th, 1802.
The defendants, by their petition stated, that in pursuance of this order, of the 12th of November, the auditor had summoned Hannah Marches to appear before him, at his office, on the 28th of the same month, to testify on their behaííj which She had not done. Whereupon they prayed for an attachment, &c.
2d December, 1805. — Hanson, Chancellor. — Ordered, that, unless Hannah Marches, of Baltimore, shall, on the 13th day of this month, appear before Samuel W. Lee, a justice of the peace of Baltimore county, and answer such interrogatories as shall be proposed by either, or any of the parties to this cause, she shall be considered as acting in contempt of this court; and an attachment shall forthwith issue against her; provided a copy of this order be served on the said Hannah Marches before the 11th instant.
The defendants, by their petition stated, that the witness Hannah Marches had appeared before the justice of the peace as required; but, that she had not given a full answer to the interrogatories exhibited to her by the petitioners. Whereupon they prayed for an attachment, &c.
21st December, 1805. — Hanson, Chancellor.-^-Ordered, that unless Hannah Marches, lately Hannah' Onion, shall, before the 25th day of January next, appear before some judge, or justice of the peace, and give a plain, full, and direct answer to the second interrogatory, on the 13th instant proposed to her, and evasively answered in the presence of Samuel W. Lee, a magistrate, an attachment of contempt,, on application, shall be issued against her,.returnable immediately: Provided, a copy of this order, and of the said interrogatory be served on her at any time before the 10th day of January next; and provided too,- that the paper marked No. 1, be shewn to her at the time of her appearing to answer as aforesaid. The said interrogatory and the answer thereto have been laid before the Chancellor. The answer' to the second interrogatory is defective and evasive, inasmuch as she does not say whether or not the name ‘Hannah Onion,’ signed to the said paper marked No. L shewn to her, at the time of exhibiting said interrogatory, is her hand-writing.
*86 All the testimony, required by the parties, having been taken and returned; the auditor having stated and reported accounts as required; to which exceptions were filed; and the case having been set down for hearing, it was brought before the court.
28th December, 1S07. — Kiltv, Chancellor. — The object of the bill, in this case, was to obtain an allowance of certain payments and discounts, against a judgment obtained by McComas for the use of Smith, on a bond given by Onion; and to obtain an injunction against the said judgment; and also for general relief.
The Chancellor has considered the exceptions to the auditor's report, and is of opinion, that they ought to be overruled, and that it ought to be and is hereby confirmed — Whereupon it is Decreed, that the injunction heretofore issued in this case be perpetual; and that the defendant William McComas, pay to the complainant John B. Onion, or bring into this court to be paid to him, the sum of £1324 5s. 6d. with interest thereon from the 28th day of August, 1806, until paid; and that the defendant Thomas R. Smith be dismissed. The parties respectively to pay their own costs. — M. S.

 Wellesley v. The Duke of Beaufort, 3 Cond. Chan. Rep. 1; Park’s His. Co. Chan. 441.

 Winder v. Diffenderffer order, 4 May, 1829, post.

 1715 ch.39, s 2.

 Carroll’s lessee v. Llewellin, 1 H. & McH. 162; Smith’s lessee v. Steele, 1 H. & McH; 419; Massey v. Massey, 4 H. & J. 142; Darby v. Mayer, 10 Wheat. 465; Since so expressly declared by 1831, ch. 315, s. 1.